HORACE HASKINS & another *vs.* GEORGE W. WARREN & others.

Suffolk.    November 18, 1872, March 21. — September 7, 1874.

An unqualified delivery of goods sold for cash is a release or waiver of the right of the seller to the goods, whether this right is in the nature of a condition affecting the title, or only a lien for the price.

If goods sold are delivered to the purchaser, and there is evidence that the delivery was for the purpose of examination or other special and limited purpose, and not for the purpose of giving absolute possession to the purchaser, evidence is admissible that it was in the usual course of dealing to give opportunity for examination in that mode.

If goods sold are delivered for the purpose of completing the sale, evidence of a usage that the sale is not completed is inadmissible.

A usage that no title passes upon an ordinary sale and delivery, without actual payment of the consideration within a certain number of days, is unreasonable and invalid.

Usage of trade is a matter of fact, not of opinion; it may be proved by witnesses testifying of its existence and uniformity from their knowledge obtained by observation of what is practised by themselves and others in the trade to which 't relates

but their conclusions or inferences as to its effect, either upon the contract or the legal title or rights of parties, are not competent to show the character or force of the usage.

Usage is not allowed to control the express intention of parties to an agreement; nor the interpretation and effect which result from an established rule of law applicable to it; nor to engraft on a contract of sale a stipulation or obligation different from or inconsistent with the rule of the common law on the same subject.

In an action by the seller of goods to rescind the sale on the ground of fraud, evidence of other purchases made by the person charged with the fraud, at or about the same time, is competent, if the purchases are so connected as to show a general purpose in the transactions, or that the party was conducting business in some unusual manner, indicating an expectation of failure; and evidence is inadmissible in defence to show that the persons from whom the other purchases were made brought suits to rescind the sales made by them, and afterwards abandoned them.

In an action by a seller of goods to rescind a sale on the ground of fraud, evidence that the party charged with the fraud overdrew his bank account daily at and before the time of the purchase, is competent as tending to show that he must have been aware of his condition.

In an action by the seller of goods to rescind the sale on the ground of fraud, if the party charged with the fraud soon after the sale went into bankruptcy, the amount of his liabilities at the time of his failure is a fact competent to be proved in the case; and testimony of the assignees of the bankrupt on this point, and on the amount realized from the assets of the bankrupt estate, is admissible.

If goods have been obtained from their owner by fraud, the burden of proof is upon one who claims under the fraudulent purchaser to show that he is a *bonâ fide* purchaser for value.

In an action of replevin against B. to obtain goods sold by the plaintiff to A., and by him to B., if the plaintiff seeks to rescind the sale on the ground of fraud on the part of A., evidence that A. filed a voluntary petition in bankruptcy after the sale to B., and that he was adjudicated a bankrupt thereon, is inadmissible.

A. bought cotton and shipped it to B., drawing on him for the amount of the purchase under an agreement by which B. was to sell the cotton, and, after deducting all expenses, pay one half the profit to A. B. sold the cotton to C., who sold it to D. *Held*, that A. was interested only in the profits, and was not a necessary party to a suit by B. against D., in which B. sought to recover the cotton on the ground that it was obtained from him by fraud.

REPLEVIN of 70 bales of cotton. Writ dated December 9, 1868. At the trial in the Superior Court, before *Devens*, J., the following facts appeared: J. N. Brooks, one of the firm of J. N. Brooks & Co., cotton brokers of Boston, who were employed by the plaintiffs to sell this cotton, on Friday, December 4, 1868, went to the office of Jenkins Brothers & Chipman, cotton dealers in Boston, and offered the cotton to them for sale; they made an offer for it, which was communicated by Brooks to the plaintiffs, and by them declined; and the plaintiffs then informed Brooks that he might sell it at twenty-five cents per pound. Brooks then went to Jen-

kins Brothers & Chipman and offered to sell it to them at that price, and they accepted the offer, remarking that the price was the highest in the market, but that they had a place for the cotton. These transactions on the part of Jenkins Brothers & Chipman were conducted by Henry W. Jenkins, a member of the firm, with whom Brooks was well acquainted. Nothing was said as to the time of payment. Brooks, upon returning to his office, directed his partner to enter the sale, and some questions arose between Brooks and his partner whether the name of the purchasing firm had not been changed. Brooks's partner made out a sale note of the cotton on December 4, 1868, and sent it on the same day to the plaintiffs' store in Boston, and they received it on the afternoon of that day, the sale note, when so sent, containing the name of Jenkins Brothers & Co. as purchasers. There was at that time in Boston a firm by the name of Jenkins Brothers & Co., who sometimes purchased cotton; but the plaintiffs did not know that firm except by name, and did not know their place of business, nor who composed the firm, and had never had any dealings with them. There was evidence tending to show that Jenkins Brothers & Chipman, on the afternoon of the same day, sent their cotton sampler, Dennis Driscoll, to the plaintiffs' store, on Broad Street, Boston, to sample the cotton; and that he went there and informed Montague, one of the plaintiffs, that he had been sent by Jenkins Brothers & Chipman to sample the cotton; that Montague replied that it was not usual to sample cotton before it was weighed, and told Driscoll where he could get at the cotton, and that Driscoll sampled it the same day, and took the samples to Jenkins Brothers & Chipman.

Samuel L. Montague, one of the plaintiffs, called as a witness on his own behalf, testified on direct examination that his firm owned the cotton replevied; that on Friday, December 4, he found the sale note on his desk made out to Jenkins Brothers & Co.; that he gave orders that night to have the cotton, which was then in a loft, lowered down and weighed and left in the store; that it was to be weighed by persons employed by his firm; that it was lowered down and weighed the next morning; that he left the store between nine and ten o'clock, and on his return, about one o'clock, the cotton had been delivered on an order signed by Jenkins Brothers & Chipman; that he then went to Brooks &

Co., showed them the order, and told them that the sale note had been written Jenkins Brothers & Co., and he supposed the cotton had been sold to them; that Brooks & Co. said they supposed the cotton had been so sold; but on looking at the directory they found that it was Jenkins Brothers & Chipman; that the witness about Saturday afternoon altered the sale note by changing " & Co." to " & Chipman." That the practice is, after cotton is weighed, for the weigher to make a certificate and hand it to the seller; that in this case the certificate was attached to the bill and sent by mail to Jenkins Brothers & Chipman on Saturday or Monday. On Tuesday, December 8, the witness heard of the failure of Jenkins Brothers & Chipman, and on Wednesday morning found the cotton on board a vessel at Constitution Wharf.

On cross-examination the bill of the cotton was produced, and was as follows: " Boston, December 4, '68. Messrs. Jenkins, Bros. & Chipman, To Haskins & Montague Dr. To 70 bales 30,402 lbs. — 7600.50." The witness also testified that the transaction was so entered on the books of his firm.

Horace Haskins, one of the plaintiffs, testified that on December 8, he went to the store of Jenkins Brothers & Chipman and demanded payment for the cotton, and was told by Jenkins that he could not pay for it, that his firm had stopped payment. On cross-examination this witness testified that the cotton replevied was bought by a person named Mead in Charleston, South Carolina, who shipped it to the plaintiffs and drew for the whole amount of the expenses; that the plaintiffs were to sell the cotton, and if there was any profit Mead was to have one half; that if there was a loss the plaintiffs would have to stand the loss, as Mead was not a man of pecuniary responsibility, unless there was a profit on another lot.

It also appeared in evidence that the cotton was lowered down from the plaintiffs' loft and weighed on the morning of December 5, and that on the same morning on which it was weighed, Jenkins Brothers & Chipman directed Johnson & Co., teamsters, to go and get the cotton and carry it to the defendants' storehouse on Constitution Wharf, and Johnson & Co. sent by one of their teamsters an order of Jenkins Brothers & Chipman to the plaintiffs' store for the cotton, and the order was delivered on the

same morning at the plaintiffs' store by the teamster, to one Hill, who was in the employment of the plaintiffs, and a part of whose business, generally, it was to deliver cotton from their store. Hill testified that he told the teamster bringing the order that he had no authority to deliver it, and no orders to deliver it; and that the teamster said it was all right, and that the teamsters proceeded to load it, and did load it on their trucks and carted it from the store. That he did not prevent its going because he supposed the plaintiff Montague was then at Jenkins Brothers & Chipman, and might have sent down for it. The evidence was conflicting on this point, the teamsters swearing that nothing of the kind was said, and that there was no refusal to deliver it; and there was evidence tending to show that Montague was at the store when the teamsters went there and delivered the order, and that the lowering down from the loft and weighing and loading were going on at the same time, and that the plaintiffs' men assisted the teamsters; but there was a conflict of evidence on this point.

There was also evidence tending to show, and there was no evidence to the contrary, that the sale note, bill and certificate of weights were received by Jenkins Brothers & Chipman, — a copy of the said sale note * is in the margin.

There was also evidence tending to show, and there was no evidence to the contrary, that the cotton was carried by the teamsters to the storehouse of Warren & Co. on December 5; that nothing further was done by the plaintiffs until the after-noon of Tuesday, December 8, 1868, when the plaintiffs having heard of the failure of Jenkins Brothers & Chipman on that day, the plaintiff Haskins, as testified to by him, applied to them to pay for the cotton, and Jenkins Brothers & Chipman informed him that they were unable to do so ; that they had sold the cotton and got their pay for it. On the next day the plaintiffs replevied the cotton.

There was also evidence tending to show that the defendants, prior to October, 1868, had lent money to Jenkins Brothers &

---

* " Boston, December 4, 1868.  Sold to Jenkins Bros. & Chipman.  For
Marks.     account of Haskins & Montague.  70 bales cotton a 25c.  J. N
  ┌───┐    Brooks & Co."
  │ H │
  └───┘

Chipman on cotton as security, and that in pursuance of an agree-
ment to lend them $25,000 on cotton as security, on the basis
of a bale to every $100, on October 20, 1868, lent them $5,000,
receiving a bill of lading for 42 bales of cotton, and on October
24, 1868, lent them $10,000, receiving a bill of lading of 101
bales of cotton, and on October 27, 1868, lent them $10,000,
receiving a bill of lading of 100 bales of cotton, making together
a loan of $25,000, and the security being 243· bales of cotton;
that to suit the convenience of Jenkins Brothers & Chipman, the
defendants, in pursuance of an understanding made at the time
of this loan, had from time to time, prior to said December 5,
delivered up the cotton, or bills of lading held by them as secu-
rity, upon receiving other cotton or the bills of lading therefor
as security, in place of the cotton so delivered; and that on the
morning of said December 5, Warren & Co. having 212 bales of
cotton as security for this loan, Henry W. Jenkins, in behalf
of his firm, applied to the defendants to give them, Jenkins
Brothers & Chipman, a negotiable storage receipt for 94 of the
bales of cotton which the defendants thus held as security, prom-
ising that he would send in as security 96 bales of cotton in sub-
stitution, and stating that he had agreed to sell the 94 bales.
That the defendants on the same day directed their clerk, F. A.
Downing, to make out and sign such storage receipt, and upon
the receipt of the cotton in substitution, to deliver the storage
receipt to Jenkins Brothers & Chipman; that this clerk accord-
ingly drew up the storage receipt and signed it, and upon the re-
ceipt on said December 5, into the defendants' warehouse of 86
bales of cotton from Jenkins Brothers & Chipman, in substitution
(of which 86 the 70 replevied are a part) delivered this storage
receipt on the same day to Jenkins Brothers & Chipman, dating
it back to the time when the cotton represented by it came into
said warehouse, so that storage thereon would be charged from
the proper date. Jenkins Brothers & Chipman on the same De-
cember 5, sold the cotton mentioned in that storage receipt to
Jacob Hall for $11,170.46, and indorsed and delivered the said
storage receipt to him; and Hall paid on the same day on account
of it, to Jenkins Brothers & Chipman, $8500; and on December
7, 1868, $1500; and the balance afterwards to their assignees in
bankruptcy. The defendants on December 7, 1868, delivered to

said Hall 25 bales of the cotton represented by said receipt, and on December 9, 1868, delivered to him the balance. Jenkins Brothers & Chipman failed on December 8, 1868, and their failure became known on the afternoon of that day ; and they never paid for the 70 bales.

There was evidence tending to show that the value of the whole 86 bales of which the 70 were a part was about $9600, the value of the 70 bales replevied being $7525.

The plaintiffs offered evidence tending to show that at the time of the purchase, Jenkins Brothers & Chipman were hopelessly bankrupt and knew it, and that they had already actually failed, or were using their credit and buying goods in preparation for a failure ; that they bought the goods of plaintiffs in fraud, intending not to pay for them, and contended that it was a scheme of fraud and that the defendants participated in it.

There was evidence tending to show that Jenkins Brothers & Chipman at the time of the purchase were and continued in good credit until the day of their failure, and there was also evidence tending to show, as the defendants contended, that they acted in good faith, and at the time when they received the 86 bales and delivered the storage receipt for the 94 bales, believed that Jenkins Brothers & Chipman were the owners of the 86 bales, and had no knowledge or information, or cause of belief to the contrary.

The plaintiffs controverted this evidence ; and introduced evidence in contradiction of the defendants' witnesses, and as the plaintiffs contended, tending to prove that the defendants did not act in good faith, and were in fraudulent collusion with Jenkins Brothers & Chipman, and either actually cognizant of the fraud, or having sufficient knowledge of facts to put them upon reasonable inquiry which they did not make. There was evidence tending to show that Jenkins Brothers & Chipman, on December 14, 1868, gave to the defendants the authority set forth in the paper, a copy of which is in the margin,* and that none of the cotton held by the defendants was sold before the time of the

---

* "Boston, December 14, 1868. Messrs. Warren & Co. Gentlemen : Fearing a decline in the market, and thinking it is for the interest of all parties, we hereby authorize you to sell any and all cotton you hold, upon which you have made advances to us. Jenkins Bros. & Chipman."

replevin in this case, and that all the cotton held by them, except the 70 bales, had since been sold, and after applying the proceeds, there still remains due to the defendants on said loan $10,291.49.

The plaintiffs offered to prove by the clerk of the court of bankruptcy, and the original petition and record of adjudication, that Jenkins Brothers & Chipman petitioned in bankruptcy on December 26, 1868, and were adjudged bankrupts January 2, 1869 ; the court admitted the evidence against the objection of the defendants. The plaintiffs also contended that Jenkins Brothers & Chipman's pecuniary condition had not changed between the date of said purchase and failure, and the adjudication in bankruptcy, and evidence tending to show this was afterwards introduced by the plaintiffs.

The plaintiffs introduced evidence, without objection, tending to show that by the usage and general understanding of the trade, a sale like that named in the sale note, or where no time was mentioned, was for cash, and the same as if " terms cash " were inserted in the sale note. The defendants' testimony in reply tended to show that when a sale was made of cotton for cash, or a sale was made of cotton and nothing said, it meant that payment was to be made in ten days, and that it was called cash in ten days ; that the ten days was a credit and not a mere indulgence.

The plaintiffs contended, and offered evidence to show, that there was at the time in question a usage in the trade regulating the sale of cotton for cash in Boston ; and that by the usage of trade and the general understanding among merchants, in cash sales, the goods were delivered or put into the possession of the buyer without prepayment, or first exacting payment of the money, with the understanding that it was not to pass title or be a waiver of the condition to pay cash. The defendants objected to evidence of such usage. The court ruled that evidence to show such usage was competent, and admitted it, and the defendants excepted. The evidence as to the alleged usage was stated at length. The nature of it appears in the opinion of the court.

The plaintiffs, among other evidence tending to show Jenkins Brothers & Chipman's pecuniary condition, and that they knew their condition, offered evidence which was admitted, tending to show that Jenkins Brothers & Chipman had overdrawn their

bank account at the time of the said purchase, and for a week or more prior to that time, that it had been overdrawn by checks, so that the balance would be against them at the end of each day, they making it good on the next day by deposits of other persons' checks before one o'clock, the hour of returning checks to the clearing-house. This state of things had been going on just before the purchase, and continued each day subsequently. The overdraft on December 8, 1868, exceeding their account to the amount of $37,363, which they did not make good, and which was not paid at bank. To the admission of this evidence the defendants objected.

The plaintiffs were also permitted, against the defendants' objection and exception, to show by Jenkins Brothers & Chipman's assignees in bankruptcy the amount of Jenkins Brothers & Chipman's liabilities when they failed.

The following question was asked by the plaintiffs' counsel of one of the assignees in bankruptcy, who was introduced as a witness by the plaintiffs: " How much has been realized from the assets of Jenkins Brothers & Chipman that came into your hands as assignees ? " The defendants objected ; but the court admitted the question. The witness answered as follows : " About $7000 ; I could not state exactly ; the money has been collected and deposited in bank."

After the admission of evidence as to custom and usage, and as to the amount of Jenkins Brothers & Chipman's liabilities, the defendants introduced evidence tending to show that Jenkins Brothers & Chipman, at the time of their failure, had a large nominal surplus over and above their debts ; also, that by the custom and usage in Boston on December 4 and 5, 1868, where sales of cotton were made and no time of payment was specified, ten days' credit was given from the date of sale, and that the cotton was delivered to the purchaser whenever requested by him, and that where payment was made within ten days a rebate of interest was allowed. There was also evidence tending to show that upon a sale, cotton was always weighed and samples taken from it before delivery, called redrawn samples, which were sent to the purchaser and the quality tested by a comparison of these redrawn samples with those by which the cotton was sold ; that no other or further examination was usual ; that purchasers, until

they sold again, relied upon these redrawn samples and weights and did not reweigh, and that cotton was frequently sold by the purchaser within the ten days before paying for it, changing hands sometimes three or four times in that period of time.

The plaintiffs, on the question of fraud on the part of Jenkins Brothers & Chipman, in their purchase of the seventy bales, and their pecuniary condition, were permitted to show similar purchases by them of cotton of other persons, some within a few days before the failure, and one completed subsequent to the purchase of the seventy bales, to wit, on the Monday following, the negotiations for which sale commenced upon the Saturday previous to said Monday. To the admission of this evidence the defendants objected.

The defendants offered to show that some of these other persons replevied by suits in this court the cotton so sold, and subsequently abandoned the suits, and offered the writs and docket entries in those cases in evidence ; but the presiding judge excluded the same.

There was evidence, the truth of which the plaintiffs controverted, tending to show that the defendants first heard of the failure of Jenkins Brothers & Chipman on the afternoon of December 8, 1868, and that Frank Shaw, a member of the defendant firm, on that afternoon took over to Jenkins Brothers & Chipman's office a memorandum of the cotton the defendants held as security, to ascertain about its quality and value, so as to see if they were amply secured, and that in the course of conversation at that time, he first heard that the seventy bales had been purchased of the plaintiffs and not paid for, and that he told said Jenkins that he should ship the cotton to the Liverpool house of the defendants for sale, to which Jenkins made no objection, and that on the next morning the same was, with other cotton, shipped by the defendants in a vessel loading for Liverpool. It was on board of this vessel when replevied. There was evidence tending to show that it was put on board of this vessel very early, as compared with business hours, on the morning of December 9 but there was a conflict of evidence as to the time the warehouse was opened and the cotton shipped.

The only evidence as to the plaintiffs' ownership of the cotton, and Mead's interest or ownership in it, is what is hereinbefore recited in the testimony of Montague and Haskins.

The defendants, before arguing to the jury, requested the court to rule as follows :

1. " If the plaintiffs and William Mead were jointly interested in the profit and loss on the cotton in question in this case, and the cotton was purchased by them on joint account with said Mead, then the plaintiffs cannot recover, because said Mead is not joined as a party plaintiff in this case." The presiding judge ruled that, upon the evidence of the plaintiffs, if believed, it was not necessary that said Mead should have been joined as a party plaintiff.

2. " If this cotton was purchased by Jenkins Brothers & Chipman, to be paid for by them in ten days, and no false pretences or deceptive contrivances were used by them, then the plaintiffs cannot rescind the sale even as against Jenkins Brothers & Chipman, merely because they were insolvent at the time when they made the purchase, and they knew they were insolvent, and purchased the cotton without disclosing that fact to the sellers, and at the time of the purchase had no reasonable expectation of being able to pay for the cotton in the regular and ordinary course of their, Jenkins Brothers & Chipman's business."

3. " To set aside the sale even as between Jenkins Brothers & Chipman and the plaintiffs, the jury must be satisfied that Jenkins Brothers & Chipman bought the cotton, intending, at the time when they bought it, never to pay for it ; that it is not enough that the plaintiffs satisfy the jury that Jenkins Brothers & Chipman bought the cotton not intending to pay for it, or that they had no reasonable expectation of being able to pay for it, and the burden is upon the plaintiffs to satisfy the jury on this point, and if the jury are not satisfied on this point, or are left in doubt on this point, the jury need not go further on this branch of the case."

4. " If the jury are satisfied that the defendants received the cotton in question on December 5, 1868, in substitution for other cotton which they held as collateral security for the loan, then it is not enough that the jury are satisfied that Jenkins Brothers & Chipman bought the cotton, intending, at the time they bought it, not to pay for it, but the jury must go further before they can render a verdict on that ground for the plaintiffs, and must be satisfied by the plaintiffs, and the burden of proof is upon

them to show that before or at the time when the defendants received the cotton, they knew, or were informed of, or participated in the fraud."

" What the defendants subsequently heard or learned is immaterial; and it is immaterial what their subsequent conduct was in putting the cotton on board of a vessel, if, at the time when they received the cotton, they had no knowledge or information of fraud on the part of Jenkins Brothers & Chipman in the purchase of the cotton. That the burden of proof is on the plaintiffs to satisfy the jury on both propositions. First, that Jenkins Brothers & Chipman bought the cotton, intending, at the time, not to pay for it; and secondly, that the defendants, when they received the cotton, knew, or were informed, of the fraud; and if the plaintiffs fail to satisfy the jury on either of these propositions, or the jury are left in doubt on either of these propositions, then the jury need not consider this branch of the case any further, and the defendants, so far as this branch of the case is concerned, are entitled to a verdict. And in that event, the jury will proceed to the consideration of the next ground upon which the plaintiffs rely, and that is, that the sale was a conditional sale."

5. " If the jury are satisfied that the sale of the cotton was without any time of payment being stipulated or agreed upon; or, if by the custom and usage it was to be paid for in ten days, and the plaintiffs delivered it to Jenkins Brothers & Chipman, without insisting upon the payment of the cash at the time of delivery, and thus put Jenkins Brothers & Chipman in possession of the cotton, so that they would appear, and did appear, to others to be the owners of the cotton, and they being thus in possession of it, delivered it to the defendants, in substitution for other cotton held by the defendants, as collateral security, and the defendants at the time of the delivery to them had no knowledge, or information, or cause to believe Jenkins Brothers & Chipman's title to the cotton to be defective or invalid, then the plaintiffs cannot recover."

6. " A sale for cash is or is not a conditional sale, depending upon circumstances. If it is a sale for cash to be paid in ten days from date of sale, and the property is delivered within the ten days to the purchaser without insisting upon the payment of the

money at the time of delivery, the sale is not a conditional sale, and the title to the property passes to the purchaser, and it cannot afterwards be reclaimed by the seller."

7. " If the cotton was sold and delivered by the plaintiffs to Jenkins Brothers & Chipman, and, by the usage of trade at that time, it was to be paid for in ten days from the date of sale, the plaintiffs cannot recover."

8. " If the sale was made, and no time of payment was specified, and the cotton was delivered by the plaintiffs to Jenkins Brothers & Chipman, without insisting upon the payment of the cash at the time of delivery, and without mentioning any condition, then the title to the cotton passed to Jenkins Brothers & Chipman, and the plaintiffs cannot recover."

9. " Where property is sold for cash on delivery, the seller is not bound to deliver unless the purchaser pays for it at the time of delivery; but if the seller does deliver it to the purchaser without insisting upon the condition, he thereby waives the condition and the title passes to the purchaser, and the seller cannot afterwards reclaim the property."

10. " In order to prevent the title to property, sold for cash on delivery, passing to the purchaser by a delivery, the delivery, as well as the sale, must be conditional; that is, the delivery must be upon the condition that no title to the property shall pass to the purchaser until he pays for the property, and the delivery must be stated by the seller to the purchaser to be made upon such condition."

11. " A custom or usage that the title to property sold to be paid for in ten days from the date of sale, and which has been delivered to the purchaser within the ten days, without any mention made of any condition, shall not pass to the purchaser until paid for, is not a good or valid custom."

12. " A custom or usage that cotton sold and delivered, where no time of payment is mentioned or specified, is to be paid for in ten days from the date of sale, and that a delivery thereof without any condition being mentioned or specified, is a conditional delivery and does not pass the title, is not a good or valid custom in respect to the condition, but such sale and delivery pass the title to the purchaser."

13. " The plaintiffs do not claim that any mention was made of any condition at the time of delivery, but they allege a custom among cotton dealers in December, 1868, in sales of cotton, where no time of payment is stipulated, to deliver the cotton at any time in ten days from the date of sale when requested by the purchaser, and to give the purchaser such ten days in which to pay for the cotton. This time they say is by the usage given for the purpose of examining it, without the title passing until it is paid for. Such custom is invalid, and the title to cotton so sold and delivered passes to the purchaser."

14. " An unauthorized delivery may be ratified by the seller, and if the seller, after knowing of the delivery, sends to the purchaser a bill of the property in the usual form, and a certificate of the weights of the property, as in this case, and takes no steps to reclaim the property, until after the purchaser has failed, he thereby ratifies the delivery."

The presiding judge charged the jury, among other things not now material, as follows :

" The plaintiffs say in this case that this was a fraudulent sale, that Jenkins Brothers & Chipman, at the time they bought the property, bought it intending not to pay for it, and that thus purchasing it they are entitled to recover the property in the hands of the defendants, and they are so entitled to recover provided they prove this fact, unless the defendants shall show a good title clear and independent of the fraud. In other words, in the first instance on this part of the case the burden of proof is on the plaintiffs, but if they have sustained that burden of proof, and shown you that the goods were got from their possession by fraud, then it is for the defendants to show a title which is clear of fraud, and which, notwithstanding the fraud, will enable them to hold the goods. The plaintiffs say that it was a title obtained by fraud by Jenkins Brothers & Chipman, and the fraud which they allege against Jenkins Brothers & Chipman is, that it was purchased by them with the intention of not paying for the same. In the matter of intention, they rely, as parties ordinarily or often are obliged to in many cases, upon collateral circumstances for the purpose of showing what that intent was. It does not necessarily follow that because a party is insolvent, or that because a party is borrowing money at large and usurious

interest, his purchase is a fraudulent one ; but those circumstances are circumstances to be considered in determining what his intent was ; and in the present case, taking all those circumstances together, the mode in which they were conducting their whole business, their transactions with others, the state of their finances, the mode in which they were making purchases and transfers, and the whole detail of their business which has been laid out before you, the plaintiffs contend that you must be satisfied that this was a fraudulent purchase by Jenkins Brothers & Chipman. If they have failed to satisfy you of that, of course they cannot recover ; but if they have satisfied you on that point upon a review of the whole evidence, — if you come to the conclusion that the plaintiffs have made out that this was a fraudulent purchase on the part of Jenkins Brothers & Chipman, then the plaintiffs are entitled to recover unless this can be met by the defendants. The defendants endeavor to meet it in this case by showing that they had a title which was clear of fraud, and that they were *bonâ fide* purchasers for a valuable consideration. The defendants must in order to maintain their title, show that the purchase was an honest one, and that it was made in good faith ; and they must further show that it was made for a valuable consideration.

" If the defendants made a loan of $25,000 to Jenkins Brothers & Chipman, to be secured by the pledge of collateral security, and from time to time as it was found convenient, they permitted them to change one piece of security for another, one lot for another ; and on the date in question they permitted Jenkins Brothers & Chipman to receive out of their hands the ninety-four bales of cotton, and the defendants received those eighty-six bales ; and at the time had no further knowledge of the transfer ; then, assuming that the transaction was an honest transfer, and that the only ground of claim against the defendants is upon the ground that the sale was a fraudulent sale, they would maintain their title ; because, in that case, they would show a title, in good faith and for a valuable consideration, and at the time when they received into their hands the seventy bales, they parted with other property of equal value.

" That in regard to conditional sales, the law is, that where a sale is made upon condition, that condition must be complied with before the title passes, and that if property be delivered

upon the condition that the property is not to pass to the person to whom it is delivered, except upon the performance by him of some particular act; then the property does not pass until that act is done; in other words, that the condition continues with and follows the article itself. And in this case the condition claimed by the plaintiffs is, that this was a sale made for cash, upon condition that cash should be paid to them at the time of delivery of the goods, and that even if you should find that the plaintiffs did deliver the goods (because as to the delivery there is a dispute), yet still that delivery was made under a usage of trade by which it was not a waiver of the condition. Ordinarily, if a party makes a sale upon a condition, and delivers the property without any agreement in reference to the continuance of the condition, that would be construed as a waiver of the condition, and it would be a presumption of law, that if he delivered the article without any agreement that the condition should continue, he intended to waive the condition. But in this case, the plaintiffs set up that there was a usage of trade existing in this city known to Jenkins Brothers & Chipman, as well as to themselves, under which this sale was what is called a cash sale, made upon the condition of the payment of cash, and it was not a waiver of the condition to deliver over the article to the purchaser; but that the condition continued with it, until a compliance by the purchasers with the condition. In the first place, it is necessary to consider, as a preliminary question, whether or not there was a delivery of the goods. The plaintiffs contend, in the first instance, that they never delivered those goods; and if a party gets possession of goods wrongfully, that is not delivery. If a party by a trespass, there having been a contract of sale between him and another party, he having no right to the possession of the goods, wrongfully takes possession of them, that is a trespass and not a real delivery. It is therefore necessary to consider in the first place whether or not there was a delivery of the goods in question. A delivery is essential to the completion of every sale. A sale is imperfect until there is a delivery, and that delivery may be made, of course, either actually by handing over the article, or it may be made constructively by handing over a bill of lading, or a storage receipt, or any of those things which are constructively its possession, which would give the party holding this evidence

of title the right to receive the goods. The plaintiffs in this case contend that a delivery was never made by them, but that by a wrongful act on the part of some of the servants of Jenkins Brothers & Chipman, they obtained possession of these goods. The circumstances under which they obtained possession of these goods are for you to consider. And you will determine on the evidence whether or not there was an assent by Haskins & Montague, made either by themselves or through their servants intrusted with the goods, to the taking of them by Jenkins Brothers & Chipman; because if there was such assent, that was a delivery of the goods.

"Further, whether there was or was not any assent to the taking of the goods, when the circumstances came to be known to the plaintiff Montague that the goods were actually gone (even supposing that he had intended that they should not be delivered actually into the possession of Jenkins Brothers & Chipman), did he or did he not assent to that delivery? because if he assented to that delivery or consented that the goods should remain in the possession of Jenkins Brothers & Chipman, that was a sufficient delivery, although the original act of the party who permitted them to go away had been in violation of Montague's orders, or in violation of his intention. In order to determine, then, whether Montague assented, you will consider the circumstances which have been testified to in regard to the time when Montague knew it, and the time which elapsed between that time and the time of the failure, which is the first time when Montague took active measures to get possession of the goods; and you will consider the act done by Montague, or under his direction, in the way of sending bills or weigher's receipts. If, on this testimony, the plaintiffs have failed to satisfy you that there was no delivery (because, the goods being actually in possession of Jenkins Brothers & Chipman, it is for them to show you that they were there wrongfully); if they have shown you that they were there wrongfully, that the whole thing was a trespass, as they say, and that they never assented to it, then they are entitled to a verdict upon that statement of the case. If, however, these goods were delivered to Jenkins Brothers & Chipman by the plaintiffs, or having been delivered, that delivery was assented to, then you come to the consideration of the questions which will arise under the matter of conditional sale, to which this matter of delivery is essentially a preliminary question.

" It is agreed in this case that there was nothing said upon the subject of when these goods were to be paid for ; that the written contract, so far as evidenced by the bill of sale, makes no mention of it, and there is no evidence that anything passed at the time ; but the plaintiffs contend that by the custom and usage of the trade in Boston, it was a conditional sale ; that it was a cash sale ; and if it was a cash sale, it would be a conditional sale ; because a cash sale strictly and legally, (I am not using now any artificial meaning which may be given to the words " cash sale " by usage here,) a cash sale means, if you pay me so much money, you have such an amount of goods ; the one is conditional upon the other.

" The plaintiffs contend that this was a conditional sale, and that by the terms of that condition they were entitled to have the cash upon the delivery of the goods. And they further contend (assuming now that there was a delivery by them), that by the usage of the trade as it existed in this city, that was not a waiver of the condition. By the presumption of law a delivery would be made, with the intention of passing the title, and there being no agreement as to condition, and there being no usage, it would pass the title so as to give the title to the person to whom the delivery was made. But the plaintiffs set up in this case a conditional sale ; and they further set up a usage that it is not a waiver of that condition to deliver over the goods ; but that by the usage of merchants in this city, the goods are first delivered over, in order to give the purchaser an opportunity to inspect the goods themselves more accurately, and of comparing the samples and weights ; and then, as a matter of indulgence, it is customary to allow him some little time for payment ; but that the payment is due at once ; and that, although as matter of usage it is not called for immediately, as a general thing, yet that the seller has always the right to call for it at the moment of the delivery of the goods. On the other hand, the defendants in this case contend that there is no such usage, and that where nothing is said as to the time of payment, at the time of the sale, a credit of ten days is allowed ; that that is the usage of the merchants of this city, and that a party cannot be called upon until the expiration of that ten days ; or if called upon before the expiration of the ten days, he is entitled to a rebate of the interest, because

the amount he pays is calculated upon the fact that he is to have a time equal to ten days, and that when called upon within the ten days, he is not under obligation to pay until the expiration of that time. You are to consider whether or not this custom, as it is contended for by the plaintiffs, is made out here, because they are to make out this custom that the sale is for cash, and that it is not a waiver of that condition to deliver and transfer the actual custody of the property to the other party.

" Then if you find in this case that the plaintiffs have made out that this was the usage, to deliver the goods, that this was a sale for cash according to the usage of the trade, for cash strictly, and that although in point of fact indulgence was permitted, it was indulgence only and not credit, and that by the same usage of the trade and as a part of the same usage, the seller could pass over and deliver the goods to the buyer, and yet not waive the condition of payment, then upon this part of the case the plaintiffs would be entitled to your verdict, and it would be unnecessary to go further; because if they proved a conditional sale, they would in that case have further proved that their goods were delivered over under such circumstances that the delivery could not be interpreted into a waiver of the condition, and therefore the goods would have been theirs at the time when Jenkins undertook to transfer them to the defendants, and the conditions being still annexed to them, Jenkins could not transfer them to the defendants any more than he could transfer any other piece of property from Haskins & Montague, and the plaintiffs would be entitled to recover.

" If you find that the plaintiffs are entitled to recover, either upon the ground of a conditional sale, or on the ground of a fraudulent sale, you will render a verdict for them for nominal damages; otherwise the defendants are entitled to a verdict for a sum which would be equal to the interest upon the value of this property from the time it was taken from them to the present time."

The presiding judge, before charging the jury, requested the counsel, that if in charging the jury he did not cover in the charge the subject matter of the prayers, either by charging for or against the party, they would call his attention to it at the close of the charge. After finishing the charge, the presiding judge inquired of the counsel on both sides whether there was

any matter omitted, and the counsel made no response to that in-
quiry, but the counsel for the defendants stated that he excepted
to the refusal to give the instructions requested, and to such part
of the charge as related to the subject matter of the requests.

The jury found a verdict for the plaintiffs, and the defendants
alleged exceptions.

The case was argued in November, 1872, by *J. D. Ball*, for the
defendants, and *A. A. Ranney*, for the plaintiffs ; and reargued
in March, 1874, by *B. F. Brooks & M. Storey*, for the defendants.
and *A. A. Ranney*, for the plaintiffs.

WELLS, J. Upon the facts stated in the bill of exceptions, in-
dependently of the evidence relating to usage, there was a sale of
the cotton, by which the title passed to Jenkins Brothers & Chip
man.

In a sale of chattels, when the specific articles are set apart, or
identified for the purpose, and there is no stipulation for credit,
the sale, as between the parties, takes effect at once to pass the
title to the purchaser, unless there is some agreement to the con-
trary ; and the price is also due at the same time. The seller
may maintain assumpsit for goods bargained and sold, without
any further delivery. Until the delivery is complete and absolute
he has a lien for the purchase money, and may retain possession
until payment. *Morse* v. *Sherman*, 106 Mass. 430. *Arnold* v.
*Delano*, 4 Cush. 33. *Rowley* v. *Bigelow*, 12 Pick. 307.

The promise to deliver, involved in an agreement of sale, and
the promise to pay the purchase money, are mutually dependent.
Neither party is bound to perform without cotemporaneous per
formance by the other. Payment of the price is the condition
upon which alone the purchaser can require the seller to complete
the sale by delivery of the property. But it is so at the option of
the seller. If he proceeds to deliver without insisting upon pay-
ment, and without qualifying the act in some way. the condition
or mutual dependence is waived or severed. The contract is exe-
cuted finally on his part, and he retains no lien upon the property.
Delivery of possession, unqualified, is a release or waiver of his
right, whether it be in the nature of a condition affecting the title,
or only a lien for the price. *Farlow* v. *Ellis*, 15 Gray, 229.
*Smith* v. *Dennie*, 6 Pick. 262. *Carleton* v. *Sumner*, 4 Pick. 516.
When the sale is upon credit the seller ordinarily retains no lien,
unless by special agreement.

The agreement of sale in this case was complete in all respects. Aside from the delivery, there were memoranda of the agreement in writing, sufficient to satisfy the statute of frauds. There being no provision for credit, the terms of payment are presumed to be cash. The principal question arises upon the point of delivery. There was a transfer of possession to the purchasers, with the assent or acquiescence of the sellers, such as to constitute a delivery that would discharge any condition or lien which attached to or grew out of the original transaction; unless controlled by some evidence to show that it was not for the purpose of enabling the purchaser to exercise the full rights of ownership. That the goods were bought by a trader, or for the purpose of a resale, may have an important bearing to show that an absolute delivery was intended. *Smith* v. *Dennie*, 6 Pick. 262, 266. *Burbank* v. *Crooker*, 7 Gray, 158.

To overcome the effect of such a delivery of possession to purchasers who were dealers in cotton, the plaintiffs relied mainly upon evidence of an alleged usage of trade. The offer of proof, held to be competent, was stated as follows : " That by the usage of trade and the general understanding among merchants, in cash sales, the goods were delivered or put into the possession of the buyer without prepayment, or first exacting payment of the money, with the understanding that it was not to pass title or be a waiver of the condition to pay cash."

The testimony of the plaintiffs' witnesses varied as to the details and effect of this alleged usage. The witnesses agreed, however, substantially, that it is to allow ten days " in which to have the cotton turned out, weighed, and for the purchaser to examine it and see if the weight is correct, and see if the cotton is in every way merchantable ; " that in this process the goods pass into the hands of the purchaser, without reference to payment at the time ; that in sales for cash " the custom and understanding is that the title vests in the seller until the cotton is paid for ; " that the delay for ten days in such cases is not a credit ; and that delivery is not a waiver of the condition of payment. Whether the delay of payment for ten days is a right of the purchaser, or an indulgence which may be withheld in the discretion of the seller, the testimony does not clearly indicate ; but in the instructions to the jury it is assumed to be an indulgence merely, unless they should find that credit was given.

Upon the part of the defendants there was testimony that the examination is always made from redrawn samples before delivery; that the allowance of ten days is a credit, for which a rebate of interest is allowed upon earlier payment; and that purchasers frequently resell within the ten days, and before making payment.

The instructions given to the jury allowed them to find, upon this evidence, that the sale was a conditional one, by which no title passed to the purchasers; that the delivery, although made intentionally, was no waiver of the condition; and that the goods remained the property of the plaintiffs at the time Jenkins Brothers & Chipman undertook to sell and transfer them to the defendants. It is not clear, upon the report, that the instructions did not go further, and in effect direct the jury that the plaintiffs were entitled to a verdict if they had proved the usage to be as relied on by them.

We are of opinion that the effect thus given to usage, and the range of proof admitted to establish its existence and operation, exceeded the limits within which such evidence may properly be allowed to influence the interpretation of contracts and dealings between parties.

Usage is a matter of fact, not of opinion. Usage of trade is a course of dealing; a mode of conducting transactions of a particular kind. It is proved by witnesses testifying of its existence and uniformity from their knowledge obtained by observation of what is practised by themselves and others in the trade to which it relates. But their conclusions or inferences as to its effect, either upon the contract or the legal title or rights of parties, are not competent to show the character or force of the usage. Neither is it competent for them to testify what is the understanding of others in regard to its effect. The effect is to be determined by the court, or by the jury under its direction. Like other facts and circumstances attending a transaction, usage serves to aid in interpreting and applying the words and acts or conduct of parties in their dealings with each other, when the words and acts themselves are equivocal or not explicit and decisive. Their dealings are supposed to be conducted with reference to, or at least in accordance with the usage, and it may therefore be resorted to for aid in supplying the unexpressed terms of their agreements, on

the ground of presumed intention and mutual understanding. In this way it may modify the application of general rules of law. But it cannot be allowed to control the express intention of the parties to an agreement; nor the interpretation and effect which result from an established rule of law applicable to it; nor to engraft on a contract of sale a stipulation or obligation different from or inconsistent with the rule of the common law on the same subject. *Dickinson* v. *Gay*, 7 Allen, 29. *Dodd* v. *Farlow*, 11 Allen, 426. *Boardman* v. *Spooner*, 13 Allen, 353. *Reed* v. *Richardson*, 98 Mass. 216. *Odiorne* v. *New England Ins. Co.* 101 Mass. 551. *Snelling* v. *Hall*, 107 Mass. 134. 1 Greenl. Ev. § 294. 2 Ib. § 252. 3 Kent Com. (12th ed.) 260, and note *c*.

The understanding of a community, or of a class, as to a legal effect or an implication of law, is not a valid usage; and evidence to prove it is not competent to determine legal rights under contracts. So, too, the intent or understanding with which parties enter into a particular contract, or conduct in its execution, is not properly shown by evidence of the intent or understanding with which others perform like transactions, although the evidence is sufficiently comprehensive to establish a custom or usage, if its nature would admit of it.

The evidence, upon which the question of delivery in this case was submitted to the jury, was objectionable on one or both of these grounds.

Usage in regard to the mode of carrying out the transaction of a sale of cotton may be shown, upon a disputed question of delivery. If there is any evidence tending to show that, in the particular instance, the turning out of the cotton and allowing it to go into the hands of the other party was, in fact, for the purpose of examination, or other special and limited purpose, and not to give them possession as purchasers, then proof that it was in accordance with the usual course of dealing to give opportunity for examination in that mode would be competent, in aid of the other evidence, and might become significant that such was the real character and purpose of the transfer of possession. If in fact there was no other purpose than to complete the sale by delivering the goods to them as owners by the purchase, the title would thereby become absolute in them, by operation of law; and any supposed usage to the contrary would be invalid.

*Primâ facie*, the voluntary transfer of possession is delivery; and the effect of the usage which the testimony tended to prove, so far as competent and valid, would be to give to the purchasers a right to rescind for cause discovered within the ten days, and to the sellers the right to treat the contract as rescinded if the goods were not accepted and paid for within that time ; or perhaps to revoke the delivery and restore their lien, if they could regain possession. If the allowance of ten days for examination and payment is a matter of indulgence merely, at the discretion of the seller, it is then not inconsistent with the general rule of law that delivery of possession is a waiver of the seller's lien for the price, and a waiver of payment as a condition precedent. If the seller intends to insist upon either he must refuse the indulgence, or protect his right by a special and qualified delivery.

On the other hand, to give to the supposed usage the full effect claimed for it, to wit, that no title passes upon an ordinary sale and delivery without actual payment of the consideration, would require all such transactions to be construed as mere bailments or mandates, giving to the purchaser no right to control or deal with the property in any manner except for the special purpose of examination. The expiration of ten days without payment would not discharge the condition and vest the title. What kind and degree of laches afterwards on the part of the seller might serve to do so ; and what exactly would be the relations of the parties, and the rights of those who should purchase the property while so held, are questions full of difficulty. The inevitable uncertainty of all titles to goods transmitted from hand to hand in the usual methods of sale and purchase, and the embarrassments to which commercial transactions would be constantly exposed from the operation of a usage which should so restrict the effect of a contract of sale apparently executed by delivery, are sufficient to justify if not to require its rejection as unreasonable. *Seccomb* v. *Provincial Ins. Co.* 10 Allen, 305.

Usage alone will not convert a voluntary and unqualified delivery, without payment, of goods sold for cash, into a mere deposit for examination. Such a deposit of goods that are the subject of a contract of sale to the depositary may exist, and be proved by appropriate evidence. We do not think it was so proved in this case.

We cannot anticipate what the evidence may be upon another trial. Judging from what now appears, the only right of the plaintiffs was to revoke the delivery, or to rescind the contract of sale. But as the property has passed into the hands of others upon a valuable consideration, the right to regain possession of the property by recovery against them will depend upon the question whether they hold in good faith and without being chargeable with notice of the defect of title in Jenkins Brothers & Chipman.

Upon the other ground of fraud and deceit on the part of Jenkins Brothers & Chipman, in procuring the sale to be made to them, several exceptions are taken, mostly to the admission of evidence.

Other purchases made by them of other parties about the same time may be competent, if they are so connected as to show a general purpose in their transactions, or that they were conducting business in some unusual manner, indicating an expectation of failure. *Rowley* v. *Bigelow*, 12 Pick. 307–311. *Jordan* v. *Osgood*, 109 Mass. 457, and cases cited. The exceptions do not show that such was not the case here.

That some of the other parties, of whom they had so purchased, had brought suits and abandoned them was clearly incompetent, and rightly excluded as *inter alios*.

The state of their bank account and their mode of overdrawing, for a week or more before the purchase, was competent, as tending to show that they must have been aware of their condition. *Jordan* v. *Osgood*, *supra*.

The amount of their liabilities at the time of their failure was a fact competent to be proved in the case. It had some tendency to show what their financial condition was four days previously, when the purchase was made. It might be shown by the assignees in bankruptcy, if they had the means of knowing what it was. The exceptions do not show that they had not.

The amount realized from the assets of the firm might have aided in showing their value at the time of the failure, in connection with other evidence. The exceptions do not show that this testimony was incompetent or prejudicial.

The original petition in bankruptcy was in the nature of a subsequent declaration impeaching the sale previously made by them; and the record of adjudication was *inter alios*. Neither could

properly affect the defendants, and both were wrongly admitted. *Simpson* v. *Carleton*, 1 Allen, 109, 115.

The ruling as to the burden of proof was substantially right. If the defendants undertook to set up a title better than that of Jenkins Brothers & Chipman, from whom they acquired it, it was incumbent upon them to make out the facts to sustain that proposition. *Morgan* v. *Morse*, 13 Gray, 150. The burden was upon them at least to show that they were *bonâ fide* purchasers for value. *Easter* v. *Allen*, 8 Allen, 7.

The case shows that Mead was not a partner having an interest in the capital or in the property held by the firm. He had merely a contingent interest in the profits. He was not a necessary party to the suit. *Exceptions sustained.*