St. Louis Gas-Light Company, Respondent, *v.* St. Louis Gas, Fuel and Power Company, Appellant.

June 17, 1884.

1. Constitutional Law — Highways — Streets — Privileges — Monopoly. — The state has proprietary control over highways, and a grant by it of a part of that control does not violate the constitutional provision against granting exclusive privileges.

2. —— The state may make such a grant with terms and conditions which give it the force of an inviolable contract which can not be affected by subsequent legislation.

3. —— The state constitution of 1820, article 13, section 20, by its terms, prohibits the granting of any exclusive privilege, hereditary or otherwise.

4. —— The state can not confer upon any individual or corporation the sole and exclusive privilege of making or vending any commodity.

5. —— A grant of such a privilege is a monopoly prohibited by common law and by the state constitution of 1820.

6. —— So much of the charter of the St. Louis Gas-Light Company as purports to grant an exclusive privilege of making and vending gas, is void.

7. —— So much of that charter as grants an exclusive right to use the streets for laying gas pipes, is valid, and, for the time being, is enforceable.

8. Ordinances — Construction of. — An ordinance granting a right to lay pipes in the public streets must be strictly construed, and its purposes can not be enlarged by construction.

Appeal from the St Louis Circuit Court, Lubke, J.
*Reversed and judgment.*

Randall Morgan, James O. Broadhead, Henry M. Post and Truman A. Post, for the appellant: The charter of the St. Louis Gas-Light Company, in so far as it attempted to grant to that company the exclusive right irrevocable for fifty years, to manufacture and sell gas and gas-light to private consumers in the city of St. Louis, was void, because: 1. Such a grant was contrary to section 20 of the bill of rights, of the Missouri state constitution of 1820, in force at the time of the adoption of plaintiff's charter. — See *Citizens' Gas-Light Co.* v. *Louisville Gas Co.*, Ky. L. Rep., August, 1883, p. 72; *McRee* v. *Wil. & R. R. Co.*, 2 Jones (N. C.), 190; *Norwich Gas-Light*

Co. v. *Norwich City Gas Co.*, 25 Conn. 1.    2. Any attempted grant by the legislature of the exclusive right to vend gas-light to private consumers in the city of St. Louis, was void, independently of constitutional restrictions; because the right thus to vend it was not a franchise emanating from the State, in which the State had a direct interest, and which it might bestow or deny at pleasure; but it was a right to traffic in an article of merchandise of general consumption and utility to the public; and to vest such a right in one company exclusively was nothing but a monopoly in derogation of common right, which the legislature had no power to grant. — See *Penn. R. R.* v. *Nat. R. R.*, 23 N. J. Eq. 450; *Rar. & Del. B. Co.* v. *Del. R. C. Co.*, 18 N. J. Eq. 570; *Bank* v. *Earle*, 13 Pet. 519, 595; *Jersey City Gas Co.* v. *Dwight*, 29 N. J. Eq. 248, 249; *West Sav. Fund Soc.* v. *Phil.*, 31 Pa. St. 183; *Bd. Park Com.* v. *Common Council*, 28 Mich. 238; *Live Stock Assn.* v. *Crescent City, etc.*, 1 Abb. (U. S. C. Ct.) 399; *Meth. Ch.* v. *Clarke*, 41 Mich. 737; *Atty.-Genl.* v. *Bound Brook R. R.*, 27 N. J. Eq. 19; *The People* v. *Mulholland*, 82 N. Y. 326; Cooley's Const. Lim. (5th ed.), 344, *284; Ang. & Ames on Corp., sect. 737; High Extr. Leg. Rem., 650, sects. 471, 472; *The People* v. *Utica Ins. Co.*, 15 Johns. 379, 389; *The State* v. *Bost. & Con. R. R. Co.*, 25 Vt. 442, 443; *The State* v. *Real Estate Bank*, 5 Ark. 599; 2 Bla. Com. 37; *C. C. & W. Co.* v. *The People*, 73 Ill. 547; *Thompson* v. *The People*, 23 Wend. 569; *The People* v. *Ridgely*, 21 Ill. 69; *The People* v. *Trustees*, 5 Wend. 211; *Norwich Gas-Light Co.* v. *Norwich City Gas Co.*, 25 Conn. 1; *Citizens' Gas-Light Co.* v. *Louisville Gas Co.*, Ky. L. Rep., August, 1883, p. 72; *The State* v. *Fisher*, 52 Mo. 177; *Loan Association* v. *Topeka*, 20 Wall. (U. S.) 659, 663; *City of Chicago* v. *Rumpff*, 45 Ill. 99; *Regents* v. *Williams*, 9 Gill & J. 408; *Baltimore* v. *The State*, 15 Md. 469; *Billings* v. *Hall*, 7 Cal. 1; *Thorpe* v. *R. & B. R. Co.*, 27 Vt. 143; *Wilkinson* v. *Leland*, 2 Pet. 657; Von Holdt Const. Hist. U. S. 20; Story on Const. 628;

*Mayor* v. *Thorn*, 7 Paige Ch. 261; 6 Coke, 112, case "Monopolies;" Bacon's Abr., title "Monopolies." — The state, while it has full police control over the public streets and full power to regulate their use, would have no power to confer on one gas company the exclusive right to employ the only channels and facilities for engaging in common merchandise. — *Norwich Gas Co.* v. *Norwich City Gas Co.*, *supra*; *Citizen's Gas Co.* v. *Louisville Gas Co.*, *supra*; *The State* v. *Cincinnati Gas-Light Co.*, 18 Ohio St. 262. Plaintiff's "exclusive right" can not be construed to embrace the gas manufactured by defendant. — See *Grumley* v. *Webb*, 44 Mo., 457 ; *The City* v. *Laughlin*, 49 Mo. 559; Sedgw. Stat. Law, 423 ; *Butler's Appeal*, 73 Pa. St. 452 ; *Sandemann* v. *Breach*, 7 Barn. & C. 96 ; *U. S.* v. *Irwin*, 5 McLean, 179 ; *Chapman* v. *Forsyth*, 8 How. 208 ; *Jackson* v. *Stackhouse*, 1 Cow. 122. The exclusive grant should certainly be limited to the boundaries of the city of St. Louis, as they existed at the time of the passage of plaintiff's original charter in 1837.—*Penn. R. R. Co.* v. *Can. Comm.*, 21 Pa. St. 22 ; *The State ex rel.* v. *Gas-Light Co.*, 18 Ohio St. 293, 294. If plaintiff can not recover by virtue of its exclusive rights as against all comers, under its charter grant, it can not take advantage in this proceeding of any infirmities (if such there be) in defendant's grant of power to sell illuminating gas, or to lay mains, since without such conclusive right, it can show no special injury to itself. — *O'Brien* v. *R. R.*, 17 Conn. 372 ; *Wesson* v. *Washb. Iron Co.*, 13 Allen, 95 ; *Pudsey Coal Gas Co.* v. *Corporation of Bradford*, L. R. 15 Eq. Cas. 169, 172, 173 ; *Stockport District Water Works Co.* v. *Mayor of Manchester, etc.*, 9 Jur. (N. S.) 266, 267 ; *Del. & Rar. Can. Co.* v. *Railroad*, 16 N. J. Eq. 381 ; *Bonaparte* v. *Camden, etc., Railroad*, Baldw. 231 ; *St. John* v. *McFarlan*, 33 Mich. 72 ; *Atty.-Genl.* v. *Tudor Ice Co.*, 104 Mass. 239 ; *Pixley* v. *Railroad*, 75 Va. 320 ; *Atty.-Genl.* v. *Bound Brook R. R.*, 27 N. J. Eq.

1 ; *Soc.* v. *Morris, Can. & B. Co.*, 1 N. J. Eq. 157 ; *Pres.* v. *Trenton City Br. Co.*, 13 N. J. Eq. 46 ; *Morris & Essex R. R.* v. *Pruden*, 20 N. J. Eq. 530 ; *Soc.* v. *Butler*, 12 N. J. Eq. 498 ; *Nat. Docks R. R.* v. *Railroad* 32 N. J. Eq. 755. That, in general, violations of a charter can not be inquired into, except in a direct proceeding instituted by a party having a special interest, or the State. — See *State Bank* v. *Merch. Bank of Baltimore,* 10 Mo. 130 ; Aug. Ames on Corp., sects. 777, 636 ; *Heard* v. *Talbot*, 7 Gray, 120 ; *Dyer* v. *Walker*, 40 Pa. St. 160 ; *Bank* v. *Trimble*, 6 B. Mon. 601 ; *Grand Gulf Bk.* v. *Archer*, 8 Smed. & M. 173 ; *The City* v. *Shields,* 62 Mo. 252 ; *Brookville Turnpike Co.* v. *McCarty,* 8 Ind. 394 ; High. Extr. Leg. Rem., sect. 654 ; *Nat. Docks Co.* v. *Central R. R.*, 32 N. J. Eq. 755 ; *Grand Rapids Br. Co.* v. *Prange*, 35 Mich. 403 ; *Swartwout* v. *Mich. Air Line*, 24 Mich. 389 ; *Thompson* v. *Candor*, 60 Ill. 248. The city had power, under its charter, to pass ordinance 11,358. See *The State* v. *Cincinnati Gas-Light and Coke Co.*, 18 Ohio St. 291, 295 ; *Milhau* v. *Sharp*, 15 Barb. 211, 212 ; *Plant* v. *Long Isl. R. R.*, 10 Barb. 25, 28, 29 ; *Smith* v. *Met. Gas-Light Co.*, 12 How. Pr. 189 ; *Norwich Gas Co.* v. *Norwich City Gas Co.*, 25 Conn. *supra;* *Fisher* v. *Harrisburg*, 2 Grant (Pa.), 296 ; *Strawbridge* v. *Phil.*, 13 Rep. 218 ; *West* v. *Bancroft*, 3 Vern. 37 ; Ang. on Highw., 312 ; Cooley's Const. Lim. 194, 195 ; *The People* v. *Metr. Gas-Light Co.*, 38 Mich. 154 ; *Atty.-Genl.* v. *Sheffield Gas Co.*, 22 L. J. Ch. 811 ; affirmed in *Atty.-Genl.* v. *Cambridge Gas Co.*, 38 L. J. 94 ; *Williamsport* v. *Comm.*, 82 Pa. St. 494.

GLOVER & SHEPLEY and MADILL & RALSTON, for the respondents : The charter of the plaintiff confers upon it the right to lay pipe in the streets and suburbs of the city of St. Louis and to manufacture and vend gas for light and other purposes and distribute the same to consumers through such pipe. This right is not disputed by defendant. Hence the defendant, because of the limited

character of the privileges conferred by ordinance 11,358, and the provisions of section 951 of the Revised Statutes, has no right to lay pipe in the streets of St. Louis through which to distribute gas to be used for light. And its attempts so to do are such an interference with and invasion of plaintiff's rights as to entitle plaintiff to the injunction asked and granted in this case. And this right of plaintiff to the relief granted rests upon grounds entirely distinct from the additional claim that plaintiff's charter confers upon it the exclusive right to manufacture and vend gas for light in said city. — *St. Louis R. R. Co.* v. *Northwestern St. Louis R. R. Co.*, 69 Mo. 71; *Jersey City Gas Company* v. *Dwight et al.*, 29 N. J. Eq. 242; *Raritan and Del. Bay R. R. Co.* v. *Del. and R. Ca.*, 3 C. E. Green (N. J.), 546; 8 C. E. Green (N. J.), 411; 1 C. E. Green (N. J.), 321–378; *Atlantic and Pacific R. R. Co.* v. *City of St. Louis*, 66 Mo. 256, 257; 1 Dill. on Mun. Corp. (3d ed.), sect. 89, p. 115; *Illinois Can. Co.* v. *City of St. Louis*, 2 Dill. C. C. 70; *Davis, etc.*, v. *Mayor of New York*, 14 N. Y. 500, 517, 520, 521–524; 27 N. Y. 618; 68 Mo. 115; *People's R. R.* v. *Memphis*, 10 Wall. 50 *et seq.* The charter of the plaintiff confers upon it the sole and exclusive privilege of manufacturing and of vending gaslights in the city of St. Louis until the first day of January, 1890. And the acts done and threatened by defendant were an invasion and usurpation of this privilege which were not and could not be authorized either by defendant's charter or the ordinance of the city of St. Louis known as ordinance 11,358, or by both such charter and ordinance. — *Slaughter House Cases*, 16 Wall. 65, 66; *Crescent City Gas-Light Company* v. *New Orleans Gas-Light Company*, 27 La. An. 138; *City of Memphis* v. *Memphis R. R. Co.*, 5 Heisk. (Tenn.); *The State of Wisconsin* v. *Milwaukee Gas-Light Company*, 29 Wis. 454; Morawetz on Corp., sect. 431; *Moore* v. *Veazie*, 31 Me. 360; 32 Me. 343; 14 How. (U. S.) 568; *Binghampton Bridge*, 3 Wall. 51; *The*

*State ex rel. Harris* v. *Laughlin*, 75 Mo. 150 ; *Scotland Co.*
v. *Mo., Iowa and Nebraska R. R. Co.*, 65 Mo. 135 ; *Home
of the Friendless* v. *Rowse*, 8 Wall. 436, 437 ; *City of St.
Louis* v. *St. Louis Gas-Light Company*, 70 Mo. 69 ; *St.
Louis Gas-Light Company* v. *City of St. Louis*, 46 Mo.
121–123 ; Ang. & Ames on Corp. (11th ed.) 173, 174 ;
*Robins* v. *Embry*, 1 Smed. & M. Ch. 268, 269 and 270 ;
*Arthur* v. *Commercial Bank*, 9 Smed. & M. 394 ; *The
Oakland R. R. Co.* v. *Oakland and Brooklyn R. R. Co.*,
45 Cal. 365, 378, 379 ; *National Bank* v. *Mathews*, 98 U.
S. 621 ; *Piscataqua Bridge Co.* v. *New Hampshire
Bridge Co.*, 7 N. H. 35 ; 2 Paige, 116 ; 6 Paige, 554 ; 1
Black, 358 ; 7 Cow. 33 ; 3 Wall. 210 ; 9 Ga. 517 ; 31 Miss.
679 ; 30 N. Y. 46 ; 2 Gray, 1 ; 17 Conn. 40 ; 8 Wall.
439 ; 69 Mo. 65 ; Gall. 429 ; 4 Fish. 50.

Lewis, P. J., delivered the opinion of the court

The plaintiff was incorporated by an act of the General
Assembly, approved February 4, 1837. Its charter, which
is to continue in force for fifty years from the first day of
January, 1840, contains the following provisions : —

"Sect. 22. The said company may also manufacture gas-
fittings, portable gas vessels, and apparatus of all kinds
appertaining to their business, and to sell the same, together
with such inflammable gas as may be produced from oil, coal,
tar, resin, pitch, wood, or other materials, or a combination
of any such materials, in any manner hitherto used or here-
after to be used for the purpose ; the gas to be furnished
either by fixed burners, or in a portable and condensed
state in vessels of suitable capacity and strength ; also to
vend coke, lime, ammoniacal liquor, tar or other substances,
residuum in the process of generating and purifying the
said gas.

"Sect. 23. That the St. Louis Gas-Light Company, their
successors and assigns, shall have and be entitled to the sole
and exclusive privilege of vending gas-lights and gas-fittings

in the city of St. Louis and in its suburbs, to such persons or bodies corporate as may voluntarily choose to contract for the same.

" Sect. 24. That in order to enable the said company to carry the foregoing sections into effect, they shall be and are hereby authorized to lay pipes, conduits, or rails at the expense of the company, in any of the roads or in the avenues of the suburbs, or in any of the streets or alleys of the city of St. Louis, where the same may be required."   *   *   *

By the terms of a contract entered into with the city of St. Louis on the 28th of February, 1873, " the St. Louis Gas-Light Company waives, abandons, and surrenders forever to the city of St. Louis, irrevocably, any and all claims and pretence of claims, of exclusive right to have gas-works, lay or have pipes and other appliances, vend or furnish gas, or do business as a gas company, in the following district or portion of said city, to wit:" Here follows a description of so much of the city as lies north of the south line of Washington Avenue, including all buildings fronting north upon the same south line.

The petition in this case charges, in substance, that the defendant corporation, having erected works for the purpose, announces and gives out that it intends to engage extensively in the business of making and vending, in every portion of the city, gas-lights and gas designed for illuminating uses; that it has laid pipes and made connections, and is engaged in extending the same, and in selling such gas-lights and gas, and is receiving compensation therefor. Plaintiff prays that the defendant may be restrained and enjoined, until after the first day of January, 1890, from further continuing to do any of these things in the district south of Washington Avenue. There was a hearing upon the pleadings and proofs, and a final decree granting the injunction prayed for.

The defence chiefly relied on assumes that the grant of

xclusive privileges contained in the plaintiff's charter was, and is, void; that it was in violation of existing constitutional limitations upon the powers of the legislative department, when the act was passed; and that, even without reference to such constitutional restrictions, the attempted grant was beyond the powers, as defined and understood in the necessities of civilized government, which a state may exercise over its citizens.   If any one of these propositions may be sustained by judicial authority, and the defendant is in a proper position to claim its benefits, the judgment ought to be reversed.

On the threshold of our inquiry, we are met by a claim that the supreme court of this state has solemnly adjudicated and determined the validity of the grant in question. If convinced of this, we could only follow that adjudication, and affirm the judgment in the present case.   But we think that the contrary is true.

The controlling authority over any court, of a judicial opinion delivered in another cause by its superior in appellate jurisdiction, rests upon the same solid foundation with the plea of *res judicata* and the doctrine of *stare decisis*, in cases to which they apply, and refers, generally, to the same tests for a determination of its efficacy in a given case. These all proceed upon the fundamental idea, that whatever has been once submitted to the thorough process of judicial investigation wherein each of the adverse parties, stimulated by interest in the result, and aided by all the resources from which light might come, has presented everything that could be urged in his own behalf, and thereupon an impartial arbiter has found and declared the true mean between the opposing forces, must have been properly determined if judicial methods are competent to such an end; and that it would be both useless and invidious to go over the same ground only to reach the same result.   The conditions implied in this fundamental idea are indispensable in every application of the three instrumentalities referred to.

The United States supreme court has always held that the construction of a state statute by the courts of the same state is, not merely persuasive but, controlling authority in the federal tribunals. This is quite as much as can be said of the authority of any appellate court over the rulings of its inferiors. Having in view this well settled law, the United States supreme court, in *Carroll* v. *Carroll* (16 How. 287), said : " If the construction put by the court of a state upon one of its statutes was not a matter in judgment, if it might have been decided either way without affecting any right brought in question, then, according to the principles of the common law, an opinion on such a question is not a decision. To make it so there must have been an application of the judicial mind to the precise question necessary to be determined to fix the rights of the parties and decide to whom the property in contestation belongs. And therefore this court (and other courts organized under the common law) has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties." To like effect are the remarks of Chief Justice Marshall in *Cohens* v. *The State of Virginia* ( 6 Wheat. 399) : " It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent; other principles, which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." In *Molony* v. *Downs* (8 Abb. Pr. 316), the conclusion reached by the court was not reconcilable with two cases cited in argument, which were supposed to be authoritative. Daly, J., quoted

from a distinguished writer his definition of a precedent, as "a decision arrived at by a competent tribunal, after a patient inquiry into all points bearing upon the subject decided," and found that the cases cited did not come up to such a definition.   He added: "After two days spent in the argument of this question by most able counsel, involving the examination of every authority bearing upon the question that diligence or acuteness could suggest, and giving to it such further research as the limited time afforded me would permit, I feel that I come within this learned civilian's requisition, and may assume the responsibility of refusing to adhere to, or be governed by, the authority of of a case where the point I am now required to pass upon was taken for granted without any examination, either upon principle or authority."   This last quotation, however, seems to go a step farther than is required in the present case, and further, perhaps, than would be admissible if the supposed precedent fulfilled every other requisite, saving the one found wanting by the learned judge.

An inferior court is subordinate, only as respects the judicial decisions of its superior.   Without such a qualification of authority, there would be no need for either brains or learning in any inferior tribunal.   What constitutes a judicial decision, we have shown from very high authority. In the case of a direct mandate from a superior to an inferior court, the essentials of a judicial decision are necessarily and always present.   Nothing less should be expected, when the authoritative utterance comes, not in the shape of a mandate, or at all in the cause wherein action is to be taken, but in the guise of an abstraction arising in the treatment of a different cause.   In *Attorney-General* v. *Lum* (2 Wis. 514), a true distinction is clearly outlined thus : "It is not intended to be declared that all the reasoning and instances of illustration introduced into an opinion of this court are to be adopted by inferior tribunals from which cases or matters may come here by appeal, writ of error,

or otherwise ; but it is insisted and declared that the opinion of this court upon the points in judgment, presented and passed upon in cases brought here for adjudication, are the law of the land until overruled, or otherwise annulled, and that inferior courts and tribunals must yield obedience to the law thus declared.''

The question before us is : Was it within the constitutional powers of the legislative department to grant the exclusive rights and privileges expressed in the plaintiff's charter? If there can be found a decision of our supreme court which has determined this question, then, according to the foregoing authorities (and all others on the same subject), there must have been in that decision an application of the judicial mind to this precise question, because it was necessary to determine it, in order to fix the rights of the parties and decide to whom the property (or right) in contestation belonged. It must also appear that the determination of this question was '' a matter in judgment ; '' and that, in that case, this question was not one which '' might have been decided either way without affecting any right brought in question.'' The decisions which are supposed to bear upon this matter are so utterly destitute of all these requisites, that it seems a waste of time to examine them. It would be a gross injustice to the court which rendered them, to assume that any one of its accomplished judges had this question at all present in his mind, or in any wise supposed that it was undergoing adjudication.

One of the cases is, *St. Louis Gas-Light Company* v. *City of St. Louis* (46 Mo. 121). There is no hint in that case of any question about the legislative authority to make the grant under consideration. The point of the decision was that, inasmuch as the plaintiff had practically claimed and enjoyed the exclusive privilege, as extending over the new city limits, it could not be now heard to deny that its corresponding obligations under the contract with the city were co-extensive with the same territory. It was sufficient

that the plaintiff claimed to hold under the grant; and even this bald fact was not in controversy, but was admitted on all sides, for the purposes of the case. Nothing was said by anybody about the validity or invalidity of the thing claimed.

The other case is, *City of St. Louis* v. *St. Louis Gas-Light Company* (70 Mo. 69). In this, the grant in question is referred to for the purpose of showing that, inasmuch as it was intended to be a benefit to the gas-light company, and not as a right secured to the public, the grantee might surrender it, in whole or in part, without violating any duty. This, of course, would be equally true, whether the grant was valid or void. So that, if it could be made to appear (which it can not) that the question of validity in the grant was considered, there would still be no precedent, since that question might have been decided either way, without affecting the right then under examination.

The utmost that the plaintiff can claim for these decisions is, that they interpret the charter — not the state constitution. They find the legislature intended to vest in the plaintiff certain exclusive privileges, and "take it for granted" that the legislature might lawfully do so, because no one disputes it, and they have nothing to do with a question that is not in the case. Suppose a court to try a question of title which depends upon the interpretation of a deed. The effect of the deed is determined, judgment is rendered accordingly, and this judgment is affirmed on appeal. Afterwards, in another case, wherein other rights are controverted, the same deed is attacked as being absolutely void, for forgery, or other sufficient reason. Would it ever be pretended that the decision in the first case precluded the inquiry developed in the second? Such an inquiry in that case, would be an exact parallel with the one here before us. The question whether the legislature was constitutionally empowered to create the grant of exclu-

sive privileges declared in the plaintiff's charter, is as freely open to our examination, as any question can be. We would, in our view, be recreant to the obligations of official duty, should we refuse to examine it by all the lights that may be thrown upon the way to justice between litigating parties.

The law-making power created by our state constitution has enacted in due form that the plaintiff shall have the exclusive right to manufacture and vend illuminating gas in the city of St. Louis, and to use the streets of the city for the accommodation of its pipes to be employed in conveying the manufactured article to consumers. The plaintiff has, practically, been in the actual enjoyment of this exclusive right for about forty-seven years. A proper and necessary comity between the different departments of the government would forbid any judicial interference with this enjoyment, unless such interference should be made necessary by some encroachment on adverse rights which the courts are bound to protect. There may be a question whether the present defendant is in a proper position to proceed against every feature of the privileges claimed. But, for the sake of logical arrangement, and for the purposes of the argument, we will here assume that the plaintiff's exclusive grant, in all its scope and tendencies, may be criticised in the present proceeding.

Article XIII., section 20, of the constitution of 1820, which was in force when the plaintiff's charter was passed by the General Assembly, declares: "That no title of nobility, hereditary emolument, privilege, or distinction, shall be granted." * * *

According to the usage of our language, if the particle *or* were inserted after the word *nobility*, the terms *privilege* and *distinction* would, like emolument, be qualified by the word *hereditary*. The omission occurs with the evident intent of the framers that no privilege should be granted, whether hereditary, or not.

It may clear our way somewhat to note here two or three distinctions : The word *privilege*, though nearly allied with *right*, has yet its distinctive signification.    A *right* is " that which justly belongs to any one." It may be held in common with others, or with all mankind. Every man has a right to life, to the air we breathe, and to other natural provisions for the benefit of humanity, until forfeited by crime, or surrendered to the demand of Omnipotence. But a *privilege* is defined to be " a right peculiar to some individual or body ; " " a peculiar advantage or benefit." The word implies that some other individuals or bodies — perhaps all others — are denied participation in the right, advantage, or benefit. Hence, little or nothing is added to the force of the term by prefixing the word *exclusive*. The expression " sole and exclusive privilege " in the plaintiff's charter must be considered in this inquiry, with special reference, not to the permission given the plaintiff to do the things mentioned, but to the implied command that every other person, or corporation, shall refrain from doing any of those things. The manufacture of illuminating gas, and its sale, when manufactured, to any person or persons, may not be distinguishable, on any ground of natural right, from the manufacture and sale of shoes, or any other product of human industry. But an authority to lay and maintain pipes upon or under the public streets and highways, for facilitating a delivery of the article sold, can rest upon no such ground of natural right, where the absolute control and ownership of all highways is vested in the sovereignty of the state.

A natural person may of right do whatever is not prohibited by law. But a corporation, being an artificial or created person, may do nothing but what is expressed or implied in the words which give it being. Hence, the giving of power to a corporation, in its charter, to do certain things, does not of course imply that natural persons, or other corporations of like constitution, may not do the same

things at pleasure, in the absence of a more definite prohibition. But a definite and natural prohibition always exists against the unauthorized use of that which belongs to another. From this it follows that, when a right belongs primarily and exclusively to the state, and is granted to a corporation or a natural person, no other corporation or person may exercise the same right, without a sufficient grant from the same proprietary source. This natural distinction lies at the foundation of all the authorities cited for the plaintiff in the present case in support of its first proposition, to wit: that the defendant is unwarrantably interfering with the plaintiff's franchise and should be restrained by injunction, even without any reference to the effect of the terms of exclusiveness contained in the plaintiff's charter. Their obvious application is confined to the use of the city streets for laying pipes.

The supreme court of Wisconsin says, in *The State* v. *Milwaukee Gas-Light Co.* (29 Wis. 454): "We had supposed the law to be quite well settled that the sovereign authority might grant special privileges to corporations and individuals, without violating any constitutional principle. It is frequently and constantly done by enacting various acts of incorporation of private companies for building and operating railroads, plank roads, ferries, and toll bridges, and for many other objects upon which private skill and capital can be employed." It might have been truly added that all such grants of special privileges have been generally sustained by judicial authority. At the same time the books abound in judicial denunciations of special or exclusive privileges, as " odious monopolies condemned by all free governments," as " destroying the freedom of trade, discouraging labor and industry, and contravening the equal right of all citizens to pursue a lawful occupation in a lawful manner," and as " against common right and void." The courts, then, have been warring against each other, and even against themselves, unless there may be found in cor-

rect principles a satisfactory method of discriminating between the true and the false. Such a method should be alike applicable to the constitutional inhibition of 1820, above copied, and to the protective guaranties of *magna charta* and the common law against unjust and oppressive monopolies.

It is a familiar rule of statutory construction, that when a general provision is found to be in conflict with a special provision of limited application, the latter will prevail, and the general provision must yield. *The State* v. *DeBar*, 58 Mo. 395. The rule equally applies to the primary laws of human right, whether written or unwritten. It has a peculiar force when a general prohibition is antagonized by a positive and unquestionable right. " Thou shalt not kill." But that general command may be nullified by the positive right of self-preservation, when this demands the life of a murderous assailant. The right prevails over the prohibition, whether with or without statutory enactments. Effect is often given to the true principle by interpretation. Thus, when it was enacted in Bolognia, as Puffendorf says, that whoever drew blood in the streets should be punished with the utmost severity, the drawing of blood was finally interpreted not to mean the opening of his patient's vein by a surgeon, in pursuance of his humane right and duty. If this illustration may be considered, however, as addressing itself rather to the reasonableness of an interpretation, than to any other essential, it will fit our present purpose quite as well. Upon an examination of the various classes of exclusive privileges which have uniformly been sanctioned under free government, if we shall find them grounded, in every instance, on some natural right which no prohibitory authority may question, or which no reasonable interpretation will permit to be included in any terms of general denial, there will therefore be little difficulty in perceiving that the courts have not really disagreed about the nature and tendencies, of exclusive privileges or monopolies, in

their objectionable aspects, but have only been engaged in determining what were and what were not such. The tests they have recognized will easily show to which class the present plaintiff's grant belongs.

Proprietorship implies a right of alienation, in whole or in part, of the thing held, or of any use in or domination over it. The state, by right of eminent domain or otherwise, has a proprietary control over all highways, bridges, ferries, and other conveniences dedicated to the public use for travel or transportation. It may grant to any person or corporation a part of that control. Persons and corporations other than the grantee will have no benefit of the thing granted; but why? Simply because they are not named in the grant. The state imposes on them no privations or exclusions; it only ignores them. If the enjoyment be found exclusive, this belongs, not to the grant, but to an existing condition of things independent of the grant. The state, meanwhile, merely exercises its unquestionable right to select a transferee of that which it may transfer to whom it chooses. By no reasonable interpretation can this act be held within the meaning of an inhibition against the granting of exclusive privileges. The only exclusion operating against others than the grantee, in all such cases, is that universal law which forbids any man's usurpation of proprietary rights which have never reached him from the true source of title. These plain elementary principles furnish the key to a large array of adjudications referred to in *The State* v. *Milwaukee Gas-Light Co.* (*supra*), and others cited in the interesting brief of counsel for the present plaintiff.

The right of alienation implies a further right to annex terms and conditions to the operation of the grant. This principle fully justifies all those bridge and ferry franchises, wherein the sovereign grantor has stipulated against the use of like liberties by strangers, within a certain distance on either side of the authorized location. Such a

stipulation, being within the powers committed to the state, and being included in the terms of a charter of incorporation, may acquire the force of an inviolable contract between the state and the corporation, whose obligation can not be impaired by subsequent legislation, without a violation of the federal constitution. *Binghampton Bridge Case*, 70 U. S. 51. All these incidents and effects, however evolved, rest at last upon the proprietary right of the state to bestow what no other may claim or hold without its consent. The right is none the less complete, because coupled with a trust for the public welfare and convenience. When duly exercised, with whatever accompaniments of exclusiveness against the world at large, " no one is wronged," says Judge Cooley, " when he is only excluded from that to which he never had any right." See also 6 Paige, 554; 2 Cow. 419 ; 7 Cow. 33.

Patents issued to inventors are sometimes referred to as grants of exclusive privileges. But there is no grant in the case. The inventor has a natural ownership in the product of his brain. The government confers nothing, but only protects him in the enjoyment of that which is already his. If the stranger is hindered by this protection, he is only hindered against invasion of another's right. In this case, also, he may be " excluded from that to which he never had any right," but is not, therefore, wronged. The protection of copyright stands upon the same footing of natural, positive, and impregnable right and ownership in the author or composer. Here, as elsewhere in the necessary disciplining of humanity, the civil law advances in aid of natural justice. It imposes no privation or exclusion upon any one, but holds all mankind to observance of the universal law which forbids the appropriation of another's property without his consent.

The state is specially charged with the preservation of the public health, morals, and safety. This great trust would be utterly barren, without a certain paramount right and

authority vested in the state and known as the police power. The power thus entitled is found to be supreme over all rules of action, of whatsoever origin, whether mandatory or prohibitory, in civil administration. It stands upon a higher plane, even, than the state's normal control over highways. The latter was found in the *Binghampton Bridge Case* (*supra*), to be fettered in a measure by the inhibition in the federal constitution against a law impairing the obligation of contracts ; so that a state could not resume its control over specific highway privileges, after having contracted them away to a corporation. But the same august tribunal has recently applied a contrary ruling to the police power, as exemplified in the celebrated *Slaughter House Cases* (83 U. S. 36). In the *Butcher's Union, etc., Co.* v. *The Crescent City, etc., Co.* (not yet reported), the United States supreme court holds that a contract whereby the state attempts to bargain away its police power in a certain particular is void as against a subsequent exertion of the same power in the same particular. The legislature of Louisiana had given to the Crescent City Company, in an act of incorporation, the exclusive right to have all live stock for slaughter, within certain territorial limits, landed and slaughtered at the stock-landing and slaughter-houses of the company. This act was sustained by the United States supreme court ; a majority holding that it was a valid exercise of the police power, while four justices dissented, on the ground that it was void, as a monopoly and an unauthorized grant of exclusive privileges. Afterwards, a new state constitution was adopted, under whose authority " the municipal authorities of the city of New Orleans enacted ordinances, which opened to general competition the right to build slaughterhouses, establish stock-landings, and engage in the business of butchering in that city under regulations established by those ordinances, but which were in utter disregard of the monopoly granted to the Crescent City Company, and which in effect repealed the exclusive grant made to that

company by the act of 1869." The Butcher's Union Company availed itself of these ordinances, whereupon the Crescent City Company obtained injunction, on the principal ground that the later grant of privileges impaired the obligation of its contract with the state under the act of incorporation. The United States supreme court directed a dismissal of the bill, denying that any contract obligation could operate to suspend the police power of the state. Says Miller, J.: " Nor does this proposition contravene the established principle that the legislature of a state may make contracts on many subjects which will bind it, and will bind succeeding legislatures for the time the contract has to run, so that its provisions can neither be repealed nor its obligation impaired. * * * The denial of this power, in the present instance, rests upon the ground that the power of the legislature intended to be suspended is one so indispensable to the public welfare that it can not be bargained away by contract. It is that well known but undefined power called the police power. * * * While we are not prepared to say that the legislature can make valid contracts on no subject embraced in the largest definition of the police power, we think that, in regard to two subjects so embraced it can not, by any contract, limit the exercise of those powers to the prejudice of the public welfare. These are the public health and public morals. The preservation of these is so necessary to the best interest of social organization that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime."

To this exposition of the transcendent efficacy of the police power nothing need be added to show that when acting within its legitimate sphere, and finding some grant or regulation of an exclusive and prohibitory character necessary to the due fulfilment of its purposes, it creates what might otherwise be denounced as an odious monopoly, the

power is not to be impeded on any ground of general negation falling short of the highest public necessity. Private interest must in this, as in many other instances, give way, if need be, to that paramount concern for the public health, morals, and safety, in whose behalf civil governments are instituted. No general objections against legislation of any sort can prevail over this natural and unquestionable public right, and no interpretation of them can reasonably include it.

A franchise is a "privilege of a public nature, which can not be exercised without a legislative grant." *The State* v. *Weatherby*, 45 Mo. 20. It is "a special privilege conferred by government on individuals, and which does not belong to the citizens of a country generally, by common right." *Curtis* v. *Leavitt*, 15 N. Y. 170. The exclusive rights which we have been considering, thus far, may all be comprehended within these definitions. In every instance the right comes from the state and is available to the possessor, because the state was competent to bestow it; either by right of antecedent proprietorship, by its authority to protect a natural ownership with the aids of restrictive legislation, or by virtue of the absolute sovereignty residing in the police power. We may now consider those grants of exclusive privilege which are not franchises, but which, under the name of monopolies, are uniformly denied judicial toleration.

The right of property is one of those to whose protection the highest aims of government are directed. The right to labor for the production of property is no less fundamental and unassailable. "The right of property is equally invaded by obstructing the free employment of the means of production, as by violently depriving the proprietor of the product." Say's Pol. Econ. 133. Such rights require no grant from the sovereign, but are the common property of all citizens. "This equality of right, with exemption from all disparaging and partial enactments, in the lawful pur-

suits of life, throughout the whole country, is the distinguishing privilege of the citizens of the United States. To them everywhere all pursuits, all vocations, all professions, are open without other restrictions than such as are imposed equally upon all others of the same age, sex, and condition." 83 U. S. 109. What, then, is the necessary effect, when the state undertakes to confer upon one person or corporation the sole and exclusive privilege of pursuing a lawful calling, labor, or occupation, in the manufacturing or selling of any commodity? The first visible effect is, that all persons, other than the grantee, are directly forbidden to pursue that calling, labor, or occupation. Here is no franchise within the definitions given. The privilege conferred and withheld is not one " which can not be exercised without a legislative grant," and it is one which does " belong to the citizens of a country generally by common right." The persons deprived are not in the situation of one who is " only excluded from that to which he never had any right." They have always been, and still should be, entitled, as of natural and unquestionable right. There is no granting of anything from the state's prerogatives; no protection given to an exclusive ownership already vested; nothing pretended to be done for preservation of the public health, morals, or safety. The act is sustained by no element of power confided to the government by constitutional or other authority, and comes within the technical definition of a monopoly. "A monopoly is defined to be an institution or allowance from the sovereign power of the state, by grant, commission, or otherwise, to any person or corporation, for the sole buying, selling, making, working, or using, of anything, whereby any person or persons, bodies politic or corporate, are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade. All such grants relating to any known trade or manufacture have been held by all the judges of England, whenever they have come up for consideration, to be void

at common law, as destroying the freedom of trade, discouraging labor and industry, restraining persons from getting an honest livelihood and putting it in the power of the grantees to enhance the price of commodities." *Ib.* 102.

We have devoted so much space to elementary considerations, chiefly because we find ourselves compelled to observe a distinction which appears to have been passed over in the treatment of the case by the circuit court, and also in the arguments of counsel here. We do not perceive that the making and vending of illuminating gas is necessarily inseparable from the use of the public streets for its transmission through pipes. The very terms of the plaintiff's charter assert the contrary. The gas may be "furnished either by fixed burners or in a portable and condensed state in vessels of suitable capacity and strength." This contemplates an exclusive privilege of making and selling gas, independently of the use of the streets for laying pipe. To this is added an exclusive privilege of "vending gaslights and gas-fittings in the city of St. Louis and its suburbs." In another section, the grantee is empowered to lay its pipes under the streets. Here are two distinct grants of privileges — one relating to the making and selling of commodities, and the other to the use of the highways. It may be that, practically, the possession of one of these will be of little commercial value without the other. But, when called upon to determine questions of legal right, we have nothing to do with comparisons of commercial values. It is doubtless possible for the defendant to make and sell its illuminating commodity, to some extent, at least, without using the streets for pipes. It may reach some customers through pipes laid on or under private property, and others by means of "vessels of suitable capacity and strength." The injunction as granted would prevent all this. A judicial decree in the premises should clearly define the rights of the parties, so that it may be perceived what obstacles are to be removed, in order to an

enjoyment of all that they claim, and how they may proceed, if possible, without an invasion of the rights of others.

From what has been said, the conclusion naturally follows, that so much of the plaintiff's charter as attempts to grant an exclusive privilege of making or vending illuminating gas in the city of St. Louis is void, and can not be judicially enforced. No reasonable distinction can be entertained between illuminating gas, as an article of manufacture and trade, and any other commodity which people may purchase for their personal comfort or convenience. Such a distinction has never been judicially recognized, unless in its strict relation to the use of the public streets for conveying the article through pipes, or to the lighting of streets by municipal authority for the public benefit. So much of the charter as grants an exclusive right to use the streets of the city for the laying of pipes to convey illuminating gas was a lawful exercise of power vested in the general assembly and was and is effectual for the time being. Whether it must continue to be effectual under all circumstances until the expiration of the plaintiff's charter, depends upon other considerations.

As the case stands, we are not called upon to determine whether the grant concerning the streets was shaped into a contract from which the state can not recede, so as to bestow like privileges upon parties other than the first grantee. Adjudications are not wanting to the effect that grants strongly resembling that claimed by the plaintiff are lacking in the essentials of a contract, and whose tendencies suggest, at least, that the state might, through its municipal agencies, still assert its control over the streets to the extent of permitting a competitive enjoyment by another, of the same privileges conferred upon the plaintiff. *The State* v. *Cinn. G. L. Co.*, 18 Ohio St. 262 ; *The People* v. *Bowen*, 30 Barb. 24; *Norwich G. L. C. Co.* v. *Norwich City G.*

*Co.*, 25 Conn. 19; *Citizens' G. L. Co.* v. *Louisville G. Co.*, 2 Ky. Law Rep. 72; *Charles R. Bridge* v. *Warren Br.*, 36 U. S. 548. But until the state does so, if it may, the plaintiff will be entitled to protection by injunction against rivalry by any one who can not show an authority from the same sovereign grantor. *Jersey City G. Co.* v. *Dwight*, 29 N. J. Eq. 242; *Crescent City G. Co.* v. *N. O. G. Co.*, 27 La. An. 138; *Citizens' G. L. Co.* v. *Louisville G. Co.*, *supra.* The defendant, however, is not here in a position to make the first point just stated. As a corporation, it is competent, by the terms of its amended charter, to make illuminating gas, and to sell and deliver the same, through pipes or otherwise; but an appropriation of the highway to these purposes must derive authorization from another source. A corporation may be empowered by its charter to acquire and hold real estate, but when it would purchase under this power it must first find an owner consenting to sell.

An ordinance is shown (No. 11,358) adopted by the municipal assembly of the city of St. Louis, whereby the defendant has acquired "the right and privilege of laying pipe, with all necessary and proper attachments, connections and fixtures, below the surface of any of the public streets, alleys and highways within the corporate limits of the city of St. Louis, for the purpose of heating public and private buildings," etc. This gives no more authority to lay pipe for the purpose of lighting than for the purpose of conveying water or wine. All such grants out of the state's prerogatives must be strictly construed, and nothing may be added by implication. (See cases above cited.) The municipal corporation of St. Louis, as now constituted, is the constitutional representative of the state's sovereignty with respect to the streets and alleys of the city. It might, doubtless, exercise whatever power remains in the state to grant the privileges claimed by the defendant, but it has as yet, so far as appears, done nothing in that direction. As

to the laying of pipe for lighting purposes north of Washington Avenue, all questions of right lie between the defendant and the city authorities. They do not concern the plaintiff or the present case.

The judgment of the circuit court is reversed. A final decree will be entered here, as follows: So much of the final restraining order of the circuit court as relates exclusively to the laying of pipe by the defendant in the streets, alleys and highways of the city of St. Louis, as designated, with the modifications and qualifications thereof made by a supplemental order, on February 1, 1884, will be repeated in the present decree. As to all other matters, the temporary injunction granted by the circuit court will be dissolved, and the prayer of the plaintiff denied. All the judges concur.

LEWIS, P. J., delivered the opinion of the court on a motion for a rehearing.

We have carefully examined the motion for a rehearing, with the reasons in its support, filed by counsel for the appellant, but find in them no sufficient cause for relinquishing the views expressed in our former opinion, except as to the form of the decree which should be entered here. The restraining order of the circuit court, in so far as it relates to the laying of pipes in the streets, etc., will be modified, so as to restrain the defendant from so laying pipes for the purposes of conveying or vending illuminating gas, or gas to be used for lighting; but so as not to interfere with the defendant's right to lay pipes for heating purposes, as conferred by municipal ordinance of the city of St. Louis, No. 11,358. The motion for a rehearing is overruled, with the concurrence of all the judges.