[Civ. No. 832.   Third Appellate District.—June 8, 1911.]

## COALINGA PACIFIC OIL AND GAS COMPANY, Respondent, v. ASSOCIATED OIL COMPANY, Appellant.

LEASE OF OIL LAND—CONTRACT BY SUBLESSEE TO SELL OIL SUBJECT TO LEASE—OPTION OF LESSOR.—Under a contract by plaintiff as a sublessee, subject to the terms of the lease, to sell all crude oil produced under the sublease to the defendant to the extent of 300,000 barrels, where the original lease gives the lessor the option to take all of the crude oil, or one-sixth part of it as rent, or the proceeds of the sale of one-sixth part thereof as rent, in case of the exercise of the option of the lessor to take all of the crude oil, the sublessee would be thereby relieved from all further deliveries to defendant under the contract.

ID.—SUBLEASE ASSENTED TO BY LESSOR SUBJECT TO LEASE—RIGHTS OF SUBLESSEE AND LESSEE TO "SELL PRODUCTS."—Where the sublease was assented to by the lessor, subject to the lease, the sublessee had the same rights as the lessee, in respect of the part subleased; and where the lessees had the express right "to mine, excavate, bore, . . . sink for and . . . develop petroleum upon said lands; also to remove and sell said minerals and products so obtained therefrom," it results that, in the absence of an election by

the lessor to exercise its right to purchase oil, or to take one-sixth part thereof as rent, the lessee had the clear right to sell the products and the sublessee had the same right under the sublease.

ID.—CONTRACT TO SELL "PRODUCTS" NOT LIMITED.—In the absence of any expressed election by the lessor, a contract to sell "the products" of the sublease extends to the whole of the products thereof, and is not limited to five-sixths of the products.

ID.—CLEAR AND UNAMBIGUOUS CONTRACT—PAROL EVIDENCE INADMISSIBLE.—Where the terms of a contract are clear and unambiguous, it is not permissible to resort to parol or extraneous evidence to determine their meaning.

ID.—FAILURE OF LESSOR TO EXERCISE OPTION—RIGHT PASSING TO LESSEE.—Where the lessor, having the right of option as to the mode of paying rent, fails to exercise the option within the time fixed by the contract, the right of selection then passes to the lessee to pay the money received from the sale of products as rent.

ID.—WORDS NOT SHOWING COTENANCY—TITLE IN TENANT—POWER OF SALE.—Where there are no appropriate words in the lease to indicate that the products of the land are to be held in "cotenancy," and the relation between the parties is that of landlord and tenant, then the products of the land will be deemed the property of the tenant. If the title to the oil is in the tenant, until it is produced and delivered, he may sell it and pay the landlord out of the proceeds, if he does not complain of so doing, but has authorized the lessee "to remove and sell said minerals, substances and products."

ID.—ACTION FOR PRICE OF OIL SOLD BY SUBLESSEE—DEFENDANT NOT ENTITLED TO DEDUCT RENT DUE LESSOR.—In an action by the sublessee for the price of oil sold, the defendant is not entitled to consider the sale one of five-sixths of the oil, or to deduct the amount of money due to the lessor from the price sold. It is the duty of the plaintiff to settle with the lessor, and not that of the defendant.

ID.—INADMISSIBLE EVIDENCE—DEALINGS OF DEFENDANT WITH RAILROAD COMPANY.—Evidence of dealings of the defendant with the railroad company could not bind the plaintiff, and was properly excluded.

ID.—COMPETENT LETTER EVIDENCING COMPLETION OF CONTRACT.—The court properly admitted a letter which tended to show that the plaintiff's contract with the defendant had been completed.

APPEAL from a judgment of the Superior Court of Fresno County, and from an order denying a new trial. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

Frank Short, and F. E. Cook, for Appellant.

Sutherland & Barbour, for Respondent.

CHIPMAN, P. J.—This is an action to recover the sum of $2,251.95 for 11,852.40 barrels of petroleum at nineteen cents per barrel, being the balance due on a contract by the terms of which plaintiff agreed to sell and defendant to buy 300,000 barrels of petroleum. For a second cause of action plaintiff claims the further sum of $3,597.62, alleged to be due for 8,994.06 barrels of petroleum sold and delivered to defendant by plaintiff under a contract entered into on or about January 28, 1908, at the rate of forty cents per barrel.

Defendant denies that plaintiff delivered any petroleum greater in amount than 250,138.24 barrels of oil; denies the alleged indebtedness or any indebtedness to plaintiff on account of the first alleged cause of action; denies that it entered into any contract with plaintiff on or about January 28, 1908, or at all, and denies any indebtedness to plaintiff on account of any such contract as is alleged. By way of cross-complaint, defendant alleges the execution of the contract referred to in plaintiff's first cause of action; that plaintiff delivered thereunder 250,138.24 barrels of crude petroleum and no more and has failed and refused to deliver the balance due on said contract, to wit, 49,861.76 barrels, to defendant's damage in the sum of $20,443.32.

Plaintiff had findings of fact substantially as set forth in the complaint and judgment as therein prayed for. Defendant appeals from the judgment and from the order denying its motion for a new trial.

There was considerable evidence taken for the purpose of showing the construction put upon the written contract which is the foundation of plaintiff's first cause of action. The second cause of action rests in parol. Both parties seem to think that the contract needs no extraneous facts in explanation of its true intent. They both, however, resort to the evidence in aid of their argument and we may feel obliged to follow them.

On August 20, 1902, the Southern Pacific Railroad Company, as party of the first part, entered into a lease, desig-

nated "Lease No. G 74," with one G. E. Shore, by which it leased and demised to him a certain eighty-acre tract of land situated in Fresno county; "To have and to hold the above described lands and premises, with all the appurtenances, unto the party of the second part, for the term of ten years from the 20th day of August, 1902, for the following uses and purposes, to wit: To mine, excavate, bore, drill and sink for and otherwise collect and develop asphaltum, petroleum, natural gas, tar, gypsum, coal or other minerals, substances or products under or upon said lands and premises; also to remove and sell said minerals, substances and products so obtained therefrom"; erect buildings, machinery, dig canals and ditches and do many other things mentioned in the course of the mining operations; said second party to commence work within a given time and prosecute the same diligently and to dig a certain number of wells within a certain time; if within a time named second party should obtain the mentioned substances in paying quantities, "then the party of the second part shall thereafter faithfully operate all productive wells and shall continue boring as hereinafter provided, and shall pay to the said party of the first part as rent for and during said term hereby granted, the one-sixth (1/6) part of the gross amount of all (naming said substances), or the gross amount of moneys received from the sale of said minerals, substances, and products at the option of the party of the first part exercised whenever settlements are made, as hereinafter mentioned." The share of the first party is to be delivered to it "as rent of said premises and not otherwise," and the weights and measurements "shall be by the weights and measurements of the railroad company shipping the same, or when otherwise shipped or sold, by actual weights and measurements." Second party is to collect and store said products on the premises in tanks where the same may be examined by first party and second party shall keep a correct account of all products of said land which shall be open to the inspection of first party at all times, and "for the purpose of fixing the amount of rent to be paid," second party shall on or before the tenth day of each month furnish written statements to first party's land agent of all the said products of said land, "and the delivery of said minerals and substances or payment therefor as rent

as aforesaid shall be made on or before the fifteenth day of each calendar month." It was also provided that second party should not let or sublet any of the premises nor assign the lease except by the written consent of first party. Second party was given the right to take and use the oil for development work. "The one-sixth part of the oil, minerals or other substances and products reserved herein by the Southern Pacific Railroad Company as rent, shall be delivered on board the cars of said Company, free of expense to it at the nearest or most convenient station on the line of the Company's railroad. The party of the first part shall have the privilege, if it so desires, of purchasing at the ruling market rate all the oil produced from said land and belonging to the party of the second part, his successors and assigns."

By the consent of the railroad company, Shore made a sublease of a forty-acre tract of the land to plaintiff, on August 23, 1903, and a forty-acre tract to one Myers, at a prior date, each of which sublettings contains the following: "Subject to all the conditions mentioned in lease of the Southern Pacific Railroad Company to G. E. Shore marked No. G 74 dated August 20, 1902," copy of which lease was attached and made part of said sublease. The consent of the railroad company was also given subject to the terms and conditions mentioned in said lease No. G 74.

On September 30, 1906, plaintiff and defendant entered into a written agreement reciting that whereas said seller (plaintiff) holds certain lands, describing them, "and is operating the same and producing crude petroleum therefrom, and has now four wells drilled thereon, and all of which are producing oil, and said seller desires to sell its production to said buyer (defendant); and whereas said buyer is engaged in the business of producing and marketing crude oils and desires to purchase the production of said seller; . . . Said Seller hereby agrees to sell and deliver to said Buyer and said Buyer agrees to purchase and receive from said Seller three hundred thousand (300,000) net barrels of crude petroleum, in bulk, each barrel to contain forty-two (42) gallons; said petroleum to be of a gravity of not less than fourteen (14) degrees Beaume at a temperature of sixty (60) degrees Fahrenheit. Said oil is to be delivered

by said Seller to said Buyer into Buyer's storage tanks located on Section 18, Township 20 South, Range 15 East, M. D. B. & M., Fresno County, California, at the rate of a minimum quantity of seven thousand five hundred (7500) net barrels per month and said total quantity of three hundred thousand (300,000) net barrels shall in any event be delivered in such minimum monthly quantities and completed on or before the 1st day of October, 1909. Said Buyer agrees to maintain a pipe line from Seller's present wells to storage tanks of the Buyer on Section Eighteen, Township Twenty South, Range Fifteen East, M. D. B. and M. In the event that the production from said premises at any time or times during the period of this contract, commencing on the 1st day of June, 1906, and ending on the 1st day of October, 1909, shall exceed said minimum quantity of seventy-five hundred (7500) net barrels per month, said production shall be delivered by said Seller to said Buyer as fast as such excess quantity is produced from said premises up to a maximum quantity of thirty thousand (30,000) net barrels per month, it being the true intent and meaning hereof that the total quantity of petroleum produced from said premises up to a maximum quantity of thirty thousand (30,000) net barrels per month shall be delivered as the same is produced from said premises by said Seller to said Buyer under the terms and conditions hereof. This contract shall in any event terminate and be completed when said total of three hundred thousand (300,000) net barrels have been delivered by said Seller to said Buyer. Runs are to be made in not less than one thousand (1000) barrels each. Quantities of deliveries shall be based upon gauge capacities of storage tanks of said Seller and run tickets shall be issued by said Buyer in duplicate, the original to be retained by the Buyer and the duplicate to be delivered to the Seller. . . . It is further understood and agreed that this contract is made subject to the terms and conditions of lease G 74 and between said Coalinga Pacific Oil and Gas Company and the Southern Pacific Company. Said Buyer agrees to pay said Seller at the office of the Buyer in the City and County of San Francisco in gold coin of the United States nineteen (19) cents per net barrel of forty-two (42) gallons each for all oil delivered hereunder and to make such payments on the twenty-

fifth (25th) day of each month for all deliveries made
during the preceding calendar month. Run tickets issued
to the Seller by the Buyer shall be surrendered to the Buyer
as payments are made. Said Seller agrees to in good faith
operate the wells upon said premises and any that may be
drilled thereon during the period hereof for the purpose of
producing the quantities of petroleum covered by this agree-
ment and agrees to drill additional wells thereon for that
purpose in the event the monthly quantity required to be
delivered monthly by said Seller to said Buyer as herein-
before stated, but nothing herein contained shall be construed
to obligate said Seller to deliver to Buyer hereunder any
oil other than that produced or capable of being produced
from the premises hereinabove described.''

There is no dispute of the fact that about January 28,
1908, plaintiff had delivered to defendant the 300,000 barrels
of oil. But defendant contends that there should be de-
ducted from the deliveries the one-sixth royalty oils belong-
ing, as it claims, to the lessor, the Southern Pacific Railroad
Company, as provided in the lease No. G 74. Plaintiff claims
that it had the right as a subtenant to sell all the products
of the wells, accounting only to the lessor, the railroad com-
pany; that when its deliveries amounted to 300,000 barrels
of oil, its contract obligations with defendant were fulfilled.
At no time during the delivery of oil by plaintiff to defend-
ant did the lessor, the railroad company, make any demand
on plaintiff for any of the oil or for any settlement in re-
lation thereto, and all this time it had knowledge of the
deliveries being made to defendant.

Without doubt, this lease No. G 74 became a part of the
sublease to plaintiff and also a part of the contract between
plaintiff and defendant so far as applicable to their mutual
engagements. Plaintiff, as subtenant, took its sublease bur-
dened with all the covenants of the lessee and it also took
the sublease with all the rights and privileges given by it
to the lessee. Defendant, in its contract with plaintiff, re-
served to itself ''at its option . . . to enter into the said
premises . . . and proceed to operate the wells thereon,''
should plaintiff ''refuse or neglect to operate said property
or make deliveries as hereinbefore provided,'' or if the cost
of producing oil from said premises should make it unprof-

itable to continue the work, but this was only optional with defendant and it did not, by any of the terms of its contract with plaintiff, agree to take up plaintiff's burden as a subtenant or bind itself in any way to perform the contracts undertaken by the lessee; and if it should elect to operate the property it reserved the right to charge the operating expenses to plaintiff "to and including a maximum of nineteen cents per barrel." It seems to us that the main purpose of making this contract subject to the lease, so far as it affected defendant, was that should the lessor, the railroad company, make its election to take all the oil produced by plaintiff, it would relieve plaintiff from further deliveries to defendant under the contract.

What, then, were the rights or privileges given plaintiff as subtenant under his lease No. G 74? The lease seems to answer this question in plain and unambiguous language: "To mine, excavate, bore, . . . sink for and . . . develop . . . petroleum . . . upon said lands; also to remove and sell said minerals, substances and products so obtained therefrom." The right "to remove and sell" is not restricted to the share of the oil to which the lessee is entitled by the terms of the lease; this right the lessee would have without its being given in terms. As we read this clause, the right is given to sell all of the substances mentioned when taken from the wells. This view is strengthened by the provisions that the lessee shall pay as rent "one-sixth part of the gross amount of all . . . petroleum . . . obtained from said land, or the one-sixth part of the gross amount of moneys received from the sale of said minerals, substances and products at the option of the party of the first part (lessor) exercised whenever settlements are made as hereinafter mentioned." There is nothing in the provisions for settlements (given above) which places any limitation or restriction on the right given the lessee to sell all the products of the wells. The lessor was amply protected by having an agent present to whom full returns should be made of oils produced, and it was careful to provide that all shipments should be over its lines. We are unable to discover any question of doubtful construction arising upon the point being discussed. In the absence of an election by the lessor to exercise its option to purchase all the oil produced on said land and in the

absence of any direction given to the lessee as to the disposition to be made of its one-sixth royalty, the lessee had the clear right to sell to defendant all the oil produced on the leased premises.

We are next to discover the intention of the parties plaintiff and defendant as expressed in their contract of sale and purchase. Here, too, the intention seems to be made clear and explicit by the language used, and is easily ascertainable without resort to extraneous facts or circumstances. In their preamble it is declared to be the desire of the seller "to sell its production to said Buyer" and the desire of said buyer "to purchase the production of the said Seller." We cannot agree with defendant that the terms "its production" refer only to the five-sixths part of the production which the defendant was by the lease authorized to mine and sell.

It is next provided that, in consideration of the premises, the seller "agrees to sell and deliver to said Buyer and said Buyer agrees to purchase and receive from said Seller, three hundred thousand net barrels of crude petroleum" to be delivered at the buyer's tanks "at the rate of a minimum quantity of 7,500 barrels per month, and said total quantity of 300,000 barrels shall in any event be delivered in such minimum monthly quantities and completed on or before the 1st day of October, 1909"; and it was provided that "in the event that the production from said premises . . . shall exceed said minimum quantity of 7,500 barrels per month, said production shall be delivered by said Seller to said Buyer as fast as such excess quantity is produced from said premises up to a maximum quantity of 30,000 barrels per month. . . . " And it was then provided that: "this contract shall in any event terminate and be completed when said total of 300,000 net barrels have been delivered by said Seller to said Buyer." Clearly, by these provisions, the seller covenanted to deliver this minimum of 7,500 barrels monthly and 30,000 barrels if so much was produced, though it might require the delivery of the entire products of the property and though it might require the delivery of the rentals to which the lessor was entitled, unless the lessor exercised its option to purchase or gave some direction as to the disposition to be made of its royalty. The lease was referred to in the contract and made part of it, by which defendant must have known that

16 Cal. App.—24

plaintiff had the right to sell the entire products of the wells. It was also agreed that plaintiff should operate the wells in good faith and should drill additional wells if necessary to make the deliveries provided for. We do not see how or why it became necessary to resort to extraneous facts to determine the intention of the parties, nor can we see how or why, having done so, the evidence could or should be held to vary or change or aid in ascertaining the meaning of what is set down in the contracts in plain and unambiguous terms.

The code rule for the construction of contracts is that the language used is to govern if clear and explicit and does not involve an absurdity (Civil Code, sec. 1638) ; and where the words used are unambiguous it is not permissible to resort to extraneous evidence to determine their meaning. (*Pierce* v. *Merrill*, 128 Cal. 464, [79 Am. St. Rep. 56, 61 Pac. 64] ; *Moreing* v. *Weber*, 3 Cal. App. 14, [84 Pac. 220].)

The lessee was to "pay rent" to the lessor "1-6 part of the gross amount" of oil produced *"or* the 1/6 part of the gross amount of moneys received from the sale thereof," at the option of the lessor, "exercised whenever settlements are made." Thus the lessee was either to pay in kind or in money at the option of the lessor, and nowhere in the lease is the lessee required to deliver the rentals in kind unless, at the option of the lessor, it was required to sell, as contended by defendant. Section 1449 of the Civil Code, it seems to us, is applicable here: "If the party having the right of selection between alternative acts does not give notice of his selection to the other party within the time, if any, fixed by the obligation for that purpose, or if none is so fixed, before the time at which the obligation ought to be performed, the right of selection passes to the other party." The lessor gave no notice to plaintiff that it desired the royalty paid in kind, in the absence of which plaintiff had the right under the lease to sell the oil as its own property.

There is another view of the matter suggested by respondent which has some force. The lease was very careful to define the relation between the parties to it to be that of landlord and tenant, in which case there must be some appropriate words in the lease to indicate that the product of the land is to be held in cotenancy, "or such conclusion will not

be reached. If there is nothing in the lease to indicate that intention, then the products to be delivered to the landlord after the harvest by the tenant will be deemed to be the property of the tenant until that time and treated as rent to be then paid." (*Clarke* v. *Cobb*, 121 Cal. 597, [54 Pac. 77].) If the title to the oil is in the tenant until it is produced and delivered, the right to sell it would follow as a necessary incident, and whatever this right would seem to be is a question which the landlord alone could raise, and in this case the landlord is not complaining. However this may be, the contract of lease seems to settle the question definitely, for it expressly gives to the lessee the authority "to remove and sell said minerals, substances and products."

The court found and the evidence was that, on or about January 28, 1908, plaintiff had delivered to defendant 300,000 barrels of oil and defendant had paid plaintiff for 288,147.60 barrels at nineteen cents per barrel and no more, leaving due plaintiff $2,251.95 for 11,852.40 barrels.

By this time oil had advanced to forty cents per barrel at the wells and hence arose the controversy here, defendant claiming that the deliveries under the contracts amounted only to 250,138.24 barrels, on the assumption that it had the right to deduct from the deliveries the one-sixth royalty belonging to the Southern Pacific Railroad Company.

While we think the contract of the parties needs no extraneous evidence in aid of its correct interpretation or meaning, some facts will help to show how it was executed and how the business was conducted. Plaintiff received from defendant, daily, what are called "run tickets." They read: "Received from Tank No. 271, from Coalinga Pacific O. Co. the following crude oil in bulk of 42 gallons per bbl." Then follow certain details of gravity, measurements, etc., ending: "Net amount received 1021.71 Bbls." Signed by defendant by its gauger. Also containing the following: "The undersigned certify and guarantee that they are the legal owners of the above described oil, the number of barrels stated being correct." Signed by plaintiff, by its gauger.

There was also received in evidence the form of account rendered by plaintiff. Omitting the immaterial heading, it read:

"Hanford, Cal., October 2nd, 1907.

"Associated Oil Company.  Received San Francisco, October 3rd, 1907.  Dear Sirs: Enclosed find oil tickets Nos. (then follow the numbers) for the September run.

"Total amount of oil sold to Associated..........$15,150.44
"Amount used for fuel.......................    190.00

_____

$15,340.44

"The S. P. R. R. Co. is entitled to 1-6 royalty on amount sold to A. O. Co. and also on amount used for fuel, making 1-6 royalty on 15,340.44, total due S. P. R. R. Co., 2556.74 bbls.

"Please send check as soon as possible.

"Yours Truly

"COALINGA PACIFIC OIL & GAS CO.

"By Geo. L. Bliss, Secretary.

"Associated Oil Company.  Paid Oct. 18, 1907.  Voucher No. 9411."

Witness Bliss testified that his company received no notice from the railroad company "to pay their royalty in oil or money.  I do not know as a matter of fact that the Associated Oil Company was settling with the Southern Pacific Railroad Company in some way, whether in oil or money, I understand they settled with them.  I never received any notification from the Southern Pacific Company that they were not being settled with.  With reference to these letters I wrote, sending run tickets to the Associated Oil Company down to the commencement of this action, I never received any letter from the Associated Oil Company wherein they objected to the phraseology used in my letter where I said we had sold them so many barrels of oil.  Mr. Short: Did you ever write any letters to them objecting to their accounts rendered to you showing you they had deducted and credited you with the net quantity?  No, sir."

Defendant attaches much importance to these run tickets and monthly accounts as tending to show that the contract did not include the royalty oils.  For two years accounts were made up in which the total amount of oil delivered was charged to defendant as sold, and in which plaintiff certified and guaranteed that it was the "legal owner of the above described oil."  It is true that in settling with plaintiff the

royalty oil was deducted, and it is true that accounts stated that "the S. P. R. R. Co. is entitled to 1-6 royalty on amount sold to A. O. Co." But defendant got the full amount which plaintiff agreed to deliver and it was immaterial to plaintiff in what way defendant was settling with the lessor, whether it paid the lessor the same price it had agreed to pay plaintiff or some other price, or adjusted the matter in some other way. For plaintiff had no knowledge of the terms on which defendant was dealing with the lessor, or that the lessor ever claimed the right to receive the oil in kind instead of money; and had the lessor claimed from defendant such right it certainly was not binding on plaintiff in this controversy. In view of the plain provisions of the contract and the lease, it was defendant's duty to notify plaintiff that it did not regard the royalty oil as delivered on the contract. Furthermore, in whatever view these run tickets and accounts may be regarded, they cannot be taken on their face as giving a construction in derogation of the terms of the contract itself which are free from ambiguity.

On January 22, 1908, S. Guiberson, Jr., who was connected with defendant and signed his letter as "Supt.," wrote defendant as follows:

"In looking over the Coalinga Pacific contract I find that they have delivered up to January 1st 288,147.58 bbls. net oil. Since January 1st we have received about 10,000.00, which with another tank, will complete their contract. I understand the Southern Pacific is offering them 40c. on daily runs. I was talking with Mr. Shore and Mr. Parlin (Shore was vice-president and Parlin a director of plaintiff company), and they are ready to enter into negotiations for another contract." The receipt of this letter was acknowledged by defendant on January 25th. About the same time Guiberson had a conversation by telephone with Mr. O. Scribner, secretary of defendant company, in which this same matter was discussed. He testified: "So when I called Mr. Scribner up, he said that pending the S. P. company receiving the oil or their making a new contract, after the completion of the old contract, they would receive the oil on daily runs at 40c." This information was communicated to defendant and defendant acted upon it. The witness was asked when, if at any time, defendant first objected that the contract be-

tween plaintiff and defendant had not been completed and answered: "I think the first letter I have on that was under date February 27th." It was stipulated that Scribner had authority to give whatever instructions he gave Guiberson. With this understanding plaintiff continued to make deliveries until notified by the lessor of its election to take plaintiff's oil, which occurred about February 20, 1908, and deliveries to defendant ceased February 20, 1908. On February 5, 1908, plaintiff sent in the run tickets for January and in the statement was an item of certain oil at forty cents per barrel for the excess over the amount of the original contract. On February 6, 1908, defendant's secretary, Mr. Sloan, replied: "The writer has no information which would indicate that payment should be made to you for any part of this quantity at any price other than 19c. per barrel." Mr. Guiberson's attention was called to this letter and he replied: "Oh, that is Sloan. He does not know anything about it. That is all right. That will be all right," as testified by witness Shore.

It is difficult to reconcile defendant's present contention with its conduct in authorizing deliveries of oil at forty cents per barrel after it had been informed that plaintiff's contract was completed in accordance with plaintiff's understanding of what the contract meant.

We have considered some but not all the facts and circumstances relied upon by the parties respectively as aids in the construction to be given the contract and lease. It was, perhaps, unnecessary to consider them at all in view of the explicit terms of these instruments. We fail to find in the record any substantial ground for accepting defendant's contention in the case.

From the view we have taken it follows that there is no merit in the demands of defendant's cross-complaint.

Some alleged errors of law are assigned which will be noticed. Witness Shore testified to certain conversations with witness Guiberson who represented the defendant. It is claimed that "the letter of Mr. Guiberson to Mr. Scribner was a material part of this transaction, and should have been admitted." The only letter we have found in the transcript from Mr. Guiberson to Mr. Scribner is the letter introduced by plaintiff already quoted. If defendant refers to this letter and

means that it ought *not* to have been admitted we cannot agree with defendant. It was in line with what the writer had communicated to plaintiff and was notice to defendant of the important fact that plaintiff's contract was about completed.

The letter of E. T. Dumble, who represented the Southern Pacific Railroad Company, to plaintiff, of date April 20, 1908, was an expression of Professor Dumble's opinion and was given after plaintiff had ceased to have any relations with defendant under the contract. It was properly excluded. The dealings between defendant and the railroad company were not binding on plaintiff and were properly excluded.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.