**UNITED STATES v. STANOLIND CRUDE OIL PURCHASING CO.**

**SAME v. GULF OIL CORPORATION.**

**SAME v. SINCLAIR PRAIRIE OIL CO.**

Nos. 1975–1977.

Circuit Court of Appeals, Tenth Circuit.

June 29, 1940.

J. C. Denton, R. H. Wills, J. H. Crocker, I. L. Lockewitz, and J. P. Greve, all of Tulsa, Okl., amici curiae.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

Stanolind Crude Oil Purchasing Company[1] is a corporation organized under the laws of Delaware. Sinclair Prairie Oil Company[2] is a corporation organized under the laws of Maine. Gulf Oil Corporation[3] is a corporation organized under the laws of Pennsylvania. Each is, and for many years has been, engaged in the purchasing of crude oil in the state of Oklahoma.

On November 28, 1936, the United States commenced suits in equity against each of them to recover for three per cent of the oil run to such corporations and their predecessors from leases on the Osage Indian Reservation, under division orders executed by the lessees of the leases from which the oil was run and approved by the Superintendent of the Osage Indian Agency.[4] The causes were transferred to the law docket and an amended complaint was filed in each case.

Section 1 of the Osage Allotment Act, approved June 28, 1906, 34 Stat. 539, provides for an approved roll of the Osage Tribe of Indians. Section 2 provides for the allotting of the lands in the Osage Reservation in severalty to the members of the Tribe listed on the roll. Section 3 provides that all minerals under the Osage Reservation are reserved from allotment and retained for the Tribe as a whole for a period of twenty-five years from April 8, 1906,[5] and that leases for all oil, gas, and other minerals may be made by the Osage Tribe of Indians through its Tribal Council, with the approval of the Secretary of the Interior and under such rules and regulations as he may prescribe, provided "that the royalties to be paid to the Osage tribe under any mineral lease so made shall be determined by the President of the United States." Section 4 provides that all royalty received from oil, gas, and other mineral leases shall be placed in the Treasury of the United States to the credit of the members of the Osage Tribe of Indians, as other moneys of said Tribe are to be deposited, and shall be distributed to the individual members of the Tribe according to the roll. Section 4 further provides that there shall be set aside from the royalties received from oil and gas not to exceed $50,000 per year for ten years for the support of schools on the Osage Indian Reservation. Section 5 provides that at the expiration of the trust period the minerals shall be the absolute property of the individual members of the Tribe according to the roll, or their heirs. Section 12 provides that all things necessary to carry the provisions of this act into effect, not otherwise therein specifically provided for, shall be done under the authority and direction of the Secretary of the Interior.

On June 29, 1912, the Secretary of the Interior by a written communication to the President, recommended that the Osage Indian lands in Oklahoma be leased for oil and gas mining purposes, and that the royalties be fixed as follows: "On oil—16⅔% of the gross proceeds of all oil produced."

On July 1, 1912, President Taft approved the recommendation, thereby fixing the royalty at one-sixth of the gross proceeds of all oil produced.

Regulations were adopted and promulgated by the Secretary of the Interior on July 3, 1912. They set forth in full the form of oil mining lease then required. Both that form of lease and § 24 of those regulations provided for the sale of oil through approved division orders.

On July 27, 1915, President Wilson by executive order fixed the rate of royalty as follows:

"The rate of royalty on oil to be one-sixth, except where the average daily production of producing wells on any quarter-section unit shall equal or exceed 100 barrels for calendar-month periods, the royalty on such wells to be one-fifth."

On August 26, 1915, new regulations were promulgated by the Secretary of the Interior. These incorporated a form of Osage oil mining lease. The pertinent parts thereof read as follows:

"The lessor * * * does hereby demise, grant, lease, and let * * * all the oil deposits * * * with the exclusive

---

[1] Hereinafter referred to as Stanolind.
[2] Hereinafter referred to as Sinclair.
[3] Hereinafter referred to as Gulf.
[4] Hereinafter referred to as the Superintendent.

[5] By the Act of March 2, 1929, 45 Stat. 1478, the trust period was extended to April 8, 1958.

right to extract, pipe, store, and remove oil.

"The lessee agrees to pay or cause to be paid * * * as royalty, the sum of 16⅔ per cent of the gross proceeds from sales * * * unless the Osage tribal council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of sale or removal: * *"

"All sums due as royalty or damages shall be a lien on all equipment and unsold oil on leased premises."

"All amounts due and payable under this lease shall be paid to the superintendent in St. Louis or Kansas City exchange, except that where such exchange cannot be procured, post office or express money orders will be accepted."

Section 20 of the 1915 regulations in part reads as follows:

"Royalties on all oil and gas produced in any month shall be paid on or before the 25th day of the month next succeeding, and the remittances shall be accompanied by sworn reports covering all operations, whether there has been production or not. Lessees shall show in this statement the total amount of oil and gas sold, and not merely their working interest * * *."

Section 64 of the 1915 regulations in part reads as follows:

"The Superintendent may make arrangements with the purchasers of oil for the payment of the royalty, but such arrangements, if made, shall not relieve the lessee from responsibility for the payment of the royalty, should such purchaser fail, neglect, or refuse to pay the royalty when it becomes due: Provided, That no oil shall be run to any purchaser or delivered to the pipe line or other carrier for shipment, or otherwise conveyed or removed from the leased premises, until a division order is executed, filed, and approved by the superintendent, showing the lessee has a regularly approved lease in effect, and the conditions under which the oil may be run. * * *"

With respect to the questions here presented the allegations of the three amended complaints are substantially the same.

It will be sufficient to consider the allegations made in Stanolind's amended complaint.

In the amended complaint in the Stanolind case it is alleged that the Osage Tribe of Indians is and was at all times mentioned in the complaint the owner of the petroleum beneath the surface of all the lands situate in Osage County, Oklahoma; that leasing of such lands was authorized and directed by Congress by the Act of June 28, 1906, and amendments thereto; that rules and regulations were promulgated by the Secretary of the Interior effective August 1, 1915, respecting the leasing of such land; that leases upon such lands and petroleum were executed by divers persons in the form prescribed by such rules and regulations; that Stanolind and its predecessors took, received, and acquired oil from lands owned by the Osage Tribe of Indians under division orders prepared by Stanolind, signed by the lessee of the land from which the oil was taken, and approved by the Superintendent; that such division orders contained the following provision:

"Third: The Stanolind Crude Oil Purchasing Company shall deduct three percent from all oil received from wells into the pipe lines for its account on account of dirt and sediment, and, in addition, shall deduct one-twentieth of one percent, for each degree of heat above normal temperature, and oil shall be steamed when necessary to render it merchantable."

It further alleged that Stanolind prepared such division orders and presented them to the Superintendent for approval and thereby represented to him "that there was three percent dirt and sediment in said oil"; that such representations contained in such division orders were false and were known to Stanolind to be false when it prepared such division orders and when it obtained approval thereof by the superintendent; that Stanolind knew all the oil was in fact merchantable, and the United States did not know such oil was merchantable or that such representations were false until about August 1, 1933; that such misrepresentations were made by Stanolind with the fraudulent intent and purpose of having the United States rely thereon, and with the knowledge that the United States would not know at the times of approval of such division orders that such oil did not contain three per cent of dirt and sediment, and that all of it was merchantable.

It is further alleged that on or about August 1, 1933, the Secretary of the Interior ascertained that the oil then being purchased by Stanolind from leases on lands of the Osage Tribe was all merchantable oil; that on August 1, 1933, the Secretary of the Interior directed Stanolind, and all other purchasers of oil from lands of the Osage Tribe of Indians, to pay for all such oil at the highest posted market price; that Stanolind so paid for such oil from August 1, 1933, to August 20, 1933.

That Stanolind and all other purchasers of oil, by concerted action, in order to acquire 100 per cent of such oil while paying for only 97 per cent thereof, posted a market price based on 97 per cent of the volume of oil taken.

That by virtue of the foregoing facts, Stanolind, during the period from August 1, 1915, to the date of the filing of the complaint, received from the Osage Tribe of Indians three per cent more merchantable oil than it paid for, except during the period from August 1 to August 20, 1933, and thereby became indebted to and agreed to pay the Osage Tribe of Indians the highest posted price for such three per cent of oil. The United States prays recovery for the value of such oil.

A copy of the 1915 Osage oil mining lease and of one of the division orders of Stanolind are attached to the amended complaint as exhibits and incorporated therein by reference.

It was stipulated that the Osage Tribal Council did not at any time, by resolution or any other formal action approved by the Secretary of the Interior, elect to take royalty in oil, and that the defendants are being sued exclusively as purchasers of oil. The court sustained the motion to dismiss. The United States elected not to plead further and the court entered its order dismissing the action. The United States has appealed.

■ In Oklahoma an oil and gas lease is an incorporeal hereditament or a profit à prendre. It is an interest in real property.[6]

■ Because of the vagrant and fugitive nature of oil and gas, the owner of land has no absolute right or title to the oil or gas which may permeate the strata underlying the surface of his land. He only has a qualified interest therein, namely, the exclusive right to erect structures on the surface of his land, to explore for oil and gas by drilling wells through the underlying strata, and to take therefrom and reduce to possession oil or gas found therein, and thus acquire absolute title thereto as personal property. But neither the landowner nor his lessee obtains title to the oil and gas until he reduces it to possession.[7]

■ Since the Osage Nation did not elect to take the royalty in oil, we may lay aside that type of lease providing for the payment, as royalty, of a specified portion of the oil produced. We are concerned here only with leases which provide for the payment, as royalty, of a stipulated percentage of the gross proceeds derived from the sale of oil. It is well settled that in the latter type of lease, the lessor does not acquire title to any part of the oil which the lessee produces and reduces to his possession.[8]

---

6 Commissioner of Internal Revenue v. McKinney, 10 Cir., 87 F.2d 811, 813; Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 89, 3 A.L.R. 352.

7 Rich v. Doneghey, supra, 177 P. page 89; Ohio Oil Company v. Indiana, 177 U.S. 190, 202–209, 20 S.Ct. 576, 44 L.Ed. 729; Alexander v. King, 10 Cir., 46 F.2d 235, 238, 239, 74 A.L.R. 174, certiorari denied 283 U.S. 845, 51 S. Ct. 492, 75 L.Ed. 1455.

In Rich v. Doneghey, supra, the court said [71 Okl. 204, 177 P. 89, 3 A.L.R. 352]: "But with respect to such oil and gas, they had certain rights designated by the same courts as a qualified ownership thereof, but which may be more accurately stated as exclusive right, subject to legislative control against waste and the like, to erect structures on the surface of their land, and explore therefor by drilling wells through the under-

lying strata, and to take therefrom and reduce to possession, and thus acquire absolute title as personal property to such as might be found and obtained thereby. This right is the proper subject of sale, and may be granted or reserved. Barker v. Campbell-Ratcliff Land Co. et al. [64 Okl. 249], 167 P. 468, L.R.A.1918A, 487. The right so granted or reserved, and held separate and apart from the possession of the land itself, is an incorporeal hereditament; or more specifically, as designated in the ancient French, a profit à prendre analogous to a profit to hunt and fish on the land of another. Kolachny v. Galbreath, 26 Okl. 772, 110 P. 902, 38 L.R.A.(N.S.) 451; Funk v. Haldeman et al., 53 Pa. 229; Phillips v. Springfield Crude Oil Co., 76 Kan. 783, 92 P. 1119."

8 Rich v. Doneghey, supra; Homestake Exploration Corp. v. Schoregge, 81

It follows that the oil sold under the leases here involved was the oil of the lessees, who were obligated to pay, in accordance with the terms of their leases, to the United States, for the benefit of the members of the Osage Nation, a stipulated portion of the gross proceeds derived from the sale of such oil. Whether the lessees performed the covenants of their leases with respect to the payment of royalty was no concern of the purchasers other than that the latter were required to observe the terms of the division orders.

We conclude, therefore, that Stanolind, Sinclair, and Gulf owed no obligation to the United States other than to carry out the terms of their respective division orders and that they are not liable to the United States as purchasers of oil.

But if we be wrong in the foregoing conclusions, and if Stanolind, Sinclair, and Gulf may be regarded as having purchased the oil from the Osage Nation, we are of the opinion that the facts alleged do not warrant a recovery. Stanolind, Sinclair, and Gulf paid for the oil purchased in strict accordance with the respective division orders. No further obligation rests upon them unless the provision in the division orders for the deduction of three per cent of the oil received on account of dirt and sediment was ineffectual.

Oil was first discovered in Oklahoma in the year 1884.[9] From its discovery until January, 1940, 4,626,886,419 barrels of oil have been produced and sold in Oklahoma.

During that period many new wells have been drilled and many new fields and pools have been discovered and developed. The aggregate of production in the Osage Nation exceeds 500,000,000 barrels.[10] On January 1, 1940, oil was being produced in the state from 465 different pools under 11,494 leases and from 55,495 wells.[11] Oil from these leases has been sold under vast numbers of division orders.

In the marketing of crude oil, it is the practice to run the production from the well into settling tanks and permit the heavier ingredients, constituting impurities, to settle to the bottom. The part that is not thus settled off is run into the pipe line. This practice removes a part, but not all, of the impurities and to compensate for such impurities and pipe line losses, provision is made in the division orders for deduction of a stipulated percentage.

This practice or usage of deducting three per cent on account of dirt and sediment and transportation losses had its inception in Pennsylvania.[12] During the time that oil has been produced in Oklahoma and in its neighboring state of Kansas, it has been the uniform practice and usage to incorporate in division orders a provision for the deduction of three per cent of the oil received into the pipe lines on account of dirt and sediment. This deduction is to cover not only impurities in the oil, but also shrinkage or loss during transportation.[13] Like deductions are made in other areas.[14]

Mont. 604, 264 P. 388, 391, 392; Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785, 791; American Oil & Refg. Co. v. Cornish, 173 Okl. 470, 49 P.2d 81, 82, which cites with approval Homestake Exploration Corp. v. Schoregge, supra; Ladd v. Upham, Tex.Civ.App., 58 S.W. 2d 1037, 1038, 1039; Coalinga Pac. Oil & Gas Co. v. Associated Oil Co., 16 Cal. App. 361, 116 P. 1107, 1110; Railroad Comm. of Texas v. Rowan & Nichols Oil Co., 5 Cir., 107 F.2d 70, 72; Eureka Development Co. v. Clements, 44 Idaho 484, 258 P. 371; Opinion, Hon. Robert H. Jackson, then Asst. Gen. Counsel, Bureau of Internal Revenue, XIV-1, January-June, 1935, p. 401.

[9] "Then Came Oil," Glascock, p. 114; "Oklahoma and The Mid-Continent Oil Field," p. 25.

[10] Annual Summary of Production and Pipe Line Runs, Oklahoma and Kansas, for the year of 1939—Petroleum Statistical Guide, Inc., p. 11.

[11] Annual Summary of Production and Pipe Line Runs, Oklahoma and Kansas, for the year of 1939—Petroleum Statistical Guide, Inc., p. 1.

[12] Stanolind Crude Oil Purchasing Co. v. Cornish, D.C.Okl., 16 F.Supp. 464, 467.

[13] Petroleum, 4th Ed., by Sir Boverton Redwood, § 8, p. 667; Federal Trade Commission Report on Pipe Line Transportation of Petroleum, dated February 28, 1916, pp. 77, 127; Petroleum Production, Cloud, ch. 13, p. 461; Ruling, Department of the Interior, Office of Indian Affairs, Field Service, Osage Agency. Pawhuska, Oklahoma, dated July 31, 1933, signed by C. L. Ellis, Acting Superintendent, which reads in part as follows: "Under existing regulations and custom the Superintendent of the Osage Agency has approved division orders for removal and purchase of oil from the Osage Field containing a clause providing for deduction of 3% of the oil received into the lines on account of sediment, impurities, shrinkage, etc., * * *"

[14] See Rules and Regulations Adopted

A usage is a mode of dealing generally observed in a particular trade.[15] A usage universally recognized and observed by those engaged in a particular trade throughout a state is a general usage.[16] While it must be generally recognized by those engaged in the trade, it need not be observed in every individual transaction in order to be general.[17]

The court will take judicial notice of a general trade usage.[18]

Parties to a contract are presumed to know a well-defined trade usage generally adopted by those engaged in the business to which the contract relates.[19] The Secretary of the Interior and the Superintendent were, therefore, presumed to know the existence of such trade usage at the time the division orders were presented to and approved by the Superintendent.

Under these circumstances, it seems clear to us that the inclusion of a provision for the deduction of three per cent on account of dirt and sediment could not constitute a fraudulent misrepresentation that the oil did contain three per cent of dirt and sediment. Furthermore, each division order provided solely for oil to be produced and run after its execution and approval and no one could forecast with absolute certainty the amount of dirt and sediment that would be found in the oil. That the oil produced from the Osage lands was not wholly free from dirt and sediment is shown by the order of the Secretary of the Interior on July 31, 1933.[20]

by the Railroad Commission of Texas, July 26, 1919; Federal Trade Commission Report on Pacific Coast Petroleum Industry, dated April 7, 1921, Part I, p. 162; Federal Trade Commission Report on Pipe Line Transportation of Petroleum, dated February 28, 1916, pp. 77, 127; Derricks Handbook of Petroleum, Oil Region Chronology, p. 275.

15 Haskins v. Warren, 115 Mass. 514, 535; Barreda v. Milmo Nat. Bank, Tex. Civ.App., 241 S.W. 743, 745; Ames Mercantile Co. v. Kimball S. S. Co., D.C. Cal., 125 F. 332, 336; Wilmington City Ry. Co. v. White, 6 Pennewill, Del., 363, 66 A. 1009, 1012; Milroy v. Chicago, M. & St. P. Ry. Co., 98 Iowa, 188, 67 N.W. 276, 278.

16 Chicago & A. R. Co. v. Harrington, 192 Ill. 9, 61 N.E. 622, 629; Traders' Ins. Co. v. Dobbins & Ewing, 114 Tenn. 227, 86 S.W. 383, 384; Burbridge v. Gumbel, 72 Miss. 371, 16 So. 792, 793; Crosland v. Sloan, 123 Or. 243, 261 P. 701, 703.

17 Traders' Ins. Co. v. Dobbins & Ewing, supra, 86 S.W. page 384; Rastetter v. Reynolds, 160 Ind. 133, 66 N.E. 612, 615; Gleason v. Walsh, 43 Me. 397.

18 British & American Mortgage Co. v. Tibballs, 63 Iowa 468, 19 N.W. 319, 320; Baker v. Lehman, Weil & Co., 186 Ala. 493, 65 So. 321, 323; Brown v. Piper, 91 U.S. 37, 42, 23 L.Ed. 200; Gibson v. Stevens, 8 How. 384, 49 U.S. 384, 398, 12 L.Ed. 1123; United States v. Ferger, 250 U.S. 199, 204, 39 S.Ct. 445, 63 L.Ed. 936; Mitchell v. Fisher, 168 Okl. 145, 32 P.2d 37, 39; Pruitt v. Carter, 52 Okl. 284, 152 P. 1081; Bookhart v. Langford, 128 S.C. 350, 122 S.E. 866, 867; Strasbourger v. Leerburger, 233 N.Y. 55, 134 N.E. 834, 835; Pennsylvania Steel Co. v. Title Guarantee & Trust Co., 193 N.Y. 37, 85 N.E. 820, 823.

19 Wolfe v. Texas Co., 10 Cir., 83 F.2d 425, 429, certiorari denied 299 U.S. 553, 57 S.Ct. 15, 81 L.Ed. 407; Ross v. Northrup, King & Co., 156 Wis. 327, 144 N.W. 1124, 1128; A. J. Tower Co. v. Southern Pac. Co., 184 Mass. 472, 69 N.E. 348, 349; Cormier v. H. H. Martin Lumber Co., 98 Wash. 463, 167 P. 1105, 1106; Miller v. Germain Seed & Plant Co., 193 Cal. 62, 222 P. 817, 819, 32 A.L.R. 1215; Plover Savings Bank v. Moodie, 135 Iowa 685, 110 N.W. 29, 31; Id., 135 Iowa 685, 113 N.W. 476; Ankeny v. Young Bros., 52 Wash. 235, 100 P. 736, 738; Western Petroleum Co. v. Tidal Gasoline Co., 7 Cir., 284 F. 82, 84; Silverstein v. Michau, 2 Cir., 221 F. 55, 56; Traders' Ins. Co. v. Dobbins & Ewing, supra, 86 S.W. page 384; Meyers v. Texas Company, Cal.App., 50 P.2d 487, 491; Crosland v. Sloan, supra, 261 P. page 703; Lowry v. Russell, 8 Pick., Mass., 360, 362; J. E. Smith & Co. v. Russell Lumber Co., 82 Conn. 116, 72 A. 577, 579; Douglas & Mizell v. Ham Turpentine Company, 210 Ala. 180, 97 So. 650, 652; Williston on Contracts, Rev.Ed., Vol. 3, § 661.

20 The order in part reads:

"Under existing regulations and custom the Superintendent of the Osage Agency has approved division orders for removal and purchase of oil from the Osage Field containing a clause providing for deduction of 3% of the oil received into the lines on account of sediment, impurities, shrinkage, etc., * * * It has been definitely shown by an actual test of oil from various sections of the Osage Field that the impurities *is considerably* less than the allowance called for in division orders. * * *

"(1) The percentage of impurities (water, sand, and other foreign substances not constituting a natural component

Indeed, we may take judicial notice of the fact that no crude oil is wholly free from impurities.

Moreover, it is a general rule that in order to constitute actionable fraud, a false representation must relate to a present or preexisting fact and cannot ordinarily be predicated on representations or statements which involve mere matters of futurity.[21] Statements or representations as to contingent events do not constitute fraud, although they turn out to be false.[22] Furthermore, Stanolind made no representation as to the per cent of impurities in the oil. It merely proffered a contract containing a provision for an allowance to cover such impurities. It was a term of the contract and not a representation inducing its execution. See Stark Bros. Nurseries & Orchards Co. v. Mayhew, 16 Mo. App. 60, 141 S.W. 433, 435. It cannot be tortured into a representation that the oil contained three per cent of impurities.

We conclude that the amended complaint failed to state a claim on which relief could be granted for fraud. .

The provision for the three per cent deduction is not in conflict with the executive order of the President fixing the amount of the royalty at one-sixth. Section 3 of the Act of June 28, 1906, authorized the Secretary of the Interior to make rules and regulations for the leasing of the land. Section 12 thereof provides that all things necessary to carry out the provisions of the Act not otherwise therein specifically provided for shall be done under the direction of the Secretary of the Interior. Since the first regulations were adopted on June 28, 1906, provision has been made for the sale of oil through division orders, approved by the Superintendent. See 1906 Regulations, par. 24, and 1915 Regulations, par. 64. It must be presumed that the Secretary of the Interior, when he promulgated these regulations, was cognizant of the trade usage to incorporate the three per cent deduction provision in the division orders. The Secretary of the Interior, by providing for the sale of oil through division orders, and by failing to provide that such division orders should contain the three per cent deduction provision in keeping with the general trade usage, impliedly approved the use of division orders containing such provision. The order of July 31, 1933, expressly recites that the approval of such division orders by the Superintendent had been made under existing regulations and custom. A rule or regulation promulgated by an administrative agency charged with the administration of an act has the force and effect of law if it is reasonably adapted to the administration of the act and does not contravene some statutory provision. Maryland Casualty Company v. United States, 251 U.S. 342, 349, 40 S.Ct. 155, 64 L.Ed. 297. Moreover, since the first regulations were adopted in 1906, division orders containing the three per cent deduction provision had been employed in the sale of Osage oil. During that period Congress many times amended the Act of June 28, 1906,[23] and neither expressed nor indicated its disapproval of the regulations adopted by the Secretary of the Interior or the methods employed for the sale of the oil.

Furthermore, the provisions of the executive order are general. They left the details to be worked out by the regulations of the Secretary of the Interior. All crude oil contains impurities. All of its impurities cannot be settled off. Some provision must be made for a deduction. The three per cent provision is neither unreasonable nor unfair. It is reasonable to assume that the executive order contemplated that in the marketing of the oil, well-recognized and reasonable usages would be observed and royalty payments computed accordingly.

The judgments dismissing the actions are affirmed.

part of the oil) shall be determined to the satisfaction of the supervising official, and the observed volume of oil shall be corrected to exclude the entire volume of such foreign substances."

[21] Beatrice Creamery Co. v. Goldman, 175 Okl. 300, 52 P.2d 1033, 1036; Tamm v. Ford Motor Co., 8 Cir., 80 F.2d 723, 729.

[22] Lescher v. Baird, 173 Ark. 1033, 294 S.W. 17, 19; 23 Am.Jur., p. 794, § 35.

[23] See 35 Stat. 778; 35 Stat. 1167; 37 Stat. 87; 40 Stat. 561, 579; 41 Stat. 1249; 45 Stat. 1478.